Kristy M. COLEMAN, Plaintiff,

v.

Douglas ZATECHKA, Director of Housing for the University of Nebraska, Lincoln, in his Official Capacity; Graham B. Spanier, Chancellor, University of Nebraska, in his Official Capacity; Board of Regents of the University of Nebraska, A body Corporate Politic, Defendants.

No. 4:CV92–3314.

United States District Court,
D. Nebraska.

June 8, 1993.

**1362**

Randal B. Brown, Rebecca M. Peterson, NE Advocacy Services, Inc., Lincoln, NE, for plaintiff.

John C. Wiltse, Richard R. Wood, University of NE, Lincoln, NE, for defendants.

## MEMORANDUM OF DECISION

PIESTER, United States Magistrate Judge.

Plaintiff filed this action alleging defendants have discriminated against her on account of her disability in violation of the Americans with Disabilities Act of 1990, *see* 42 U.S.C. § 12131, *et seq.*, and Section 504 of the Rehabilitation Act of 1973, *see* 29 U.S.C. § 794. Trial was held commencing on April 19, 1993 and continuing for 2 days. For reasons stated more fully below, I shall enter judgment for plaintiff.[1]

### I. *Findings of Fact*

Plaintiff, a twenty-one year old student attending the University of Nebraska, Lincoln (UNL), has cerebral palsy. Due to the resulting paresis in her legs plaintiff requires the use of a wheelchair and the services of a personal attendant to assist her with dressing, showering and toileting.

In the summer of 1991 plaintiff applied to and was accepted by UNL as an undergraduate student for the 1991–92 academic year. Prior to beginning classes she completed and submitted a residence housing contract application to secure dormitory housing. On her

---

1. The parties consented to have this action proceed before me pursuant to 28 U.S.C. § 636(c).

(Filing 31).

application plaintiff indicated she wanted a double room in Selleck Hall,[2] and preferred a nonsmoking roommate. (Exhibit 1). Because plaintiff requested a double room but did not specify a particular individual with whom she wished to be housed, she expected that her name would be placed in the pool of roommate candidates and she would be randomly assigned a roommate by the UNL Housing Department, as is UNL's usual procedure.[3] The Residence Hall Handbook, which is provided to all UNL students who request student housing, states that "[b]ecause of Federal and State law, roommate assignments will not be made on the basis of ... handicap...." (Exhibit 6 at 6; exhibit 7 at 8).[4] There is no dispute that plaintiff, having been admitted to the university and having completed and submitted a residence housing contract application requesting a double room, met all the requirements necessary to be randomly assigned a roommate.

Upon arriving at UNL in August of 1991, plaintiff discovered she had been assigned a dormitory room in Selleck hall but was disappointed to discover she had not been assigned a roommate. She later was informed that university policy prohibits the assignment of roommates to students with disabilities who require personal attendant care. The policy in question reads as follows:

2. The evidence showed that Selleck Hall has undergone more extensive modification than other residence halls and is best equipped to accommodate the needs of students with mobility impairments. Selleck is equipped with ramps, electric door openers, wider doors, bathroom and plumbing modifications, electrical modifications and warning systems. In Selleck, the cafeteria and the modified dorm rooms are located on the first floor. Selleck Hall is a co-ed dorm and has adopted a 24-hour open visitation policy; there is no limit to the number or duration of permissible visits.

3. All students who request a double room but do not request a particular roommate are placed into a roommate pool and randomly assigned a roommate by UNL Housing. An attempt is made, when possible, to match potential roommates according to smoking preference, academic interests and hobbies. Students who wish to be assigned a *particular* roommate submit their housing applications together and designate therein the name of the student with whom they wish to be housed.

Although the University will attempt to assign residence hall living accommodations to all students based upon the choices made in a student's residence hall contract application, the University cannot always do so. *In the case of students with disabilities or special medical considerations, double rooms will not be assigned if personal attendant service, nursing care, or trained animal assistance is required unless there is a mutual room request....* The University will provide a special grant to cover the difference between the double and single room rate for any student assigned to a single room as a result of this policy if the differential cannot be covered by a third party payer.

(Filing 27 at 2–3) (emphasis supplied). Thus, although it is UNL's practice to assign roommates to all students who request double rooms but do not specify particular roommates, UNL policy prohibits the assignment of roommates to students with disabilities requiring personal attendant care.[5] This is a blanket policy, and defendants testified that no individualized inquiry is made when a student with a disability requests a roommate to determine the extent of a student's disability, the dimensions of any equipment necessitated by the disability, or the number, duration and nature of any necessary personal attendant visits.

4. The residence hall contract application that plaintiff completed, signed and submitted to the university contained similar language:

By federal law, room assignments and room changes cannot be made on the basis of race, color, religion, handicap, or national or ethnic origin.

(Exhibits 1 and 2).

5. The evidence showed that although UNL will not randomly assign a roommate to disabled students requiring personal attendant care, the policy does not prevent such a student from having a "voluntary" roommate—that is, a roommate who willingly agrees in advance to live with the disabled student. As defendants stated in their answer:

Defendants have repeatedly told plaintiff that she is free to have a roommate but that the University will not require another student to be her roommate.

(Filing 4 at 2).

Defendant Zatechka testified that the policy in question was first implemented roughly thirteen years ago, at a time when UNL had a relatively small number of students with disabilities. Responding to complaints from disabled students who expressed embarrassment at having an assigned roommate present during attendant care visits, and hoping to eliminate the room change requests from assigned roommates who found themselves in what Zatechka described as a "less than desirable" situation, the university decided to permanently set aside a block of double rooms to be used as single rooms by students with disabilities requiring attendant care. The policy was intended to accommodate the privacy concerns of students with disabilities requiring attendant care and avoid the hurt feelings and administrative worries that followed the room change requests. It appears plaintiff is the first student at UNL to openly challenge the policy and request the assignment of a roommate.[6]

After plaintiff unsuccessfully renewed her request for an assigned roommate, she filed a formal complaint against UNL with the United States Department of Education's Office for Civil Rights (exhibit 106) charging that UNL did not provide students with disabilities with housing comparable to that provided other students. Shortly after the complaint was filed a meeting was scheduled between plaintiff, UNL, and the Office for Civil Rights (OCR) in an attempt to resolve the dispute. Following formal discussions, plaintiff agreed to withdraw her OCR charge in exchange for UNL's promise to make a prompt and vigorous effort to find her a "mutually acceptable" roommate for the fall 1992 term.[7]

After withdrawing her OCR complaint, plaintiff heard nothing for two months regarding UNL's attempts to find her a roommate. Believing UNL was not living up to the terms of the agreement, plaintiff filed a second OCR complaint against the university. (Exhibit 110).[8] Although UNL had not been communicating with plaintiff regarding its efforts to locate a roommate for her, the evidence showed the university had in fact been pursuing the matter during the months following the agreement.

Shortly after the agreement was signed UNL housing staff was directed by defendant Zatechka to contact certain female students and ask whether they would voluntarily agree to be plaintiff's roommate.[9] Six women were contacted; none was interested in rooming with plaintiff. Housing staff then contacted eight additional students, none of whom wanted to room with plaintiff. Plaintiff finished out the 1991–92 school year without a roommate.

Prior to beginning classes for the 1992–93 academic year plaintiff again completed and submitted a residence housing application to secure dormitory housing. On her application she once again indicated she wanted a double room in Selleck Hall and preferred a nonsmoking roommate. (Exhibit 2). Due to plaintiff's disability and need for minimal attendant care, her name was not placed in the pool of roommate candidates and she was not assigned a roommate for the 1992–93 academic year.

Despite their persistent refusal to assign plaintiff a roommate, defendants continued their efforts to locate a "voluntary" roommate for her. A form letter was sent to approximately 680 female students who had signed residence hall contracts for the 1992–

---

6. Two other students with disabilities testified that although they had roomed with friends in the past at UNL, they would not want a roommate randomly assigned to them because they would feel uncomfortable having someone they did not know present during attendant care visits. On cross examination, the students acknowledged that it was their personal choice not to be assigned a roommate.

7. Plaintiff also filed a complaint with the United States Department of Housing and Urban Development (exhibit 104) charging discrimination in housing on the basis of her disability. She dis-

missed the HUD complaint at the same time she withdrew her complaint with the Office for Civil Rights.

8. The evidence indicated that plaintiff's second complaint was formally investigated by the Office for Civil Rights, but there was no testimony regarding the outcome of such investigation.

9. An attempt was made to contact women living in Selleck Hall who were studying in health-related fields.

93 academic year, informing them that a junior studying human development and the family who uses a wheelchair and requires minimal attendant care wanted to share a room in Selleck Hall with a nonsmoking female. (Exhibit 4). Interested parties were instructed to contact housing staff. The letter generated only one response, from a student who mistakenly believed her room and board would be paid by the university if she agreed to room with plaintiff. After being informed she would be required to pay the standard rate for a double room, the student lost interest.

In a final effort to locate a voluntary roommate for plaintiff, six female students were contacted by the university and offered $550.00 off the charge for a double room if they would agree to be plaintiff's roommate. Defendant Zatechka testified that this figure was chosen because students are charged $550.00 more for single rooms than double rooms, and it was determined that a further reduction in privacy [10] was worth an additional $550.00. No student was interested.

At no time during their extensive efforts to locate a voluntary roommate for plaintiff did the university communicate to plaintiff their plans for approaching students, sending letters to students or offering financial incentives to students to persuade them to be her roommate.[11] Plaintiff acknowledges that defendants have expended a great deal of time and energy attempting to locate someone who will agree to be her roommate, but nevertheless is dissatisfied with, and offended by, the approach the university has taken in its efforts. Plaintiff does not wish to be singled out and treated differently merely

because she has a disability, and she is not asking that special accommodations be made for her; rather, she wants only to be treated like all other students who request a double room but do not specify a particular roommate—that is, she wants her name placed in the pool of students to be assigned a roommate. The university remains adamant in its position that it "will not require another student to be [plaintiff's] roommate." (Exhibit 115 at 2).

Plaintiff testified the university's refusal to assign her a roommate because of her disability, combined with the approach taken in attempting to persuade students to agree to be her roommate, has made her feel isolated and stigmatized.

When asked why she wants a roommate, plaintiff testified that when she transferred to UNL from Peru State College in 1991 she didn't know anyone in Lincoln and believed a roommate would facilitate and enhance her social involvement. Although she has since made some friends and become active in residence-hall government, she continues to believe a roommate would enable her to meet, and perhaps become friends with, people who have different interests, lifestyles and possibly even different cultures from her own. In summary, she wants the growth experience of rooming with another college student while attending UNL.[12] Contrary to defendants' suggestion that plaintiff is seeking the assignment of a roommate hoping to obtain free personal attendant care, plaintiff made it very clear that she does not expect, nor would she want, an assigned roommate to provide her with personal attendant care;

**10.** The financial incentive was premised upon the university's assumption that rooming with a disabled student such as plaintiff would impinge upon a roommate's privacy more dramatically than rooming with a nondisabled student.

**11.** Defendant Zatechka testified that although Chancellor Graham Spanier was not personally informed of each attempt to locate a voluntary roommate for plaintiff, Zatechka met with the Chancellor to explain what was being done to comply with the agreement to find plaintiff a voluntary roommate, and Spanier was aware of and approved the $550.00 financial incentive offered to encourage students to be plaintiff's roommate. Further, I note defendant Spanier

was familiar with plaintiff's request for an assigned roommate and the university's denial of same. *See* exhibit 3.

**12.** Many of the reasons given by plaintiff for wanting a roommate were also mentioned by defendant Zatechka when he was asked to identify the advantages to having a roommate. Defendant Zatechka testified that roommates provide opportunities to make new friends and have new experiences; they provide students with someone to share things with, go places with, and attend events with; and he suggested there is educational merit to rooming with another student because students learn to compromise.

that service is, and will continue to be, provided by trained professionals.[13]

Defendants admit plaintiff's name has never been placed in the pool of students to be assigned a roommate, and further admit that due to her disability and need for minimal attendant care, UNL policy excludes her from participating in the assigned roommate program.

## II. Conclusions of Law

### A. OCR Complaint

■ As a preliminary matter, I first address defendants' argument that, by agreeing to withdraw her OCR charge, plaintiff waived her right to pursue remedies afforded her under the ADA and the Rehabilitation Act for discrimination stemming from UNL's refusal to assign her a roommate. The plain language of the agreement does not support such a conclusion.

The agreement in question was clearly limited on its face to withdrawing the OCR complaint in return for the promise to find a roommate; the agreement did not mention the ADA or the Rehabilitation Act and it did not purport to resolve any potential claims thereunder. In fact, the agreement contained no "release" language whatsoever. It is difficult to understand how defendants can suggest the OCR agreement bars future litigation when the agreement did not even bar the filing of a second OCR complaint. Furthermore, even if defendants *intended* the agreement to serve as a waiver of all discrimination claims stemming from their refusal to assign her a roommate, the agreement itself does not effectuate such a waiver, and, given the plain language of the agreement, it is unlikely plaintiff (who did not consult an attorney prior to signing the OCR agreement) would have interpreted the agreement to be attempting such a broad waiver of rights. In short, plaintiff's agreement to withdraw her OCR complaint in return for the University's promise to find her a roommate did not bar her from filing this lawsuit challenging UNL's policy of refusing to assign roommates to students with disabilities using personal attendants.

### B. "Qualified" Individual—Criteria

Plaintiff has brought this action pursuant to section 504 of the Rehabilitation Act, and the Americans with Disabilities Act.[14] The Rehabilitation Act, as amended, provides in relevant part that:

> No otherwise qualified individual with handicaps ... shall, solely by reason of her or his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance....

29 U.S.C. § 794 (1988).[15] Defendants do not dispute that plaintiff is an individual with a handicap or that the university is the recipient of federal financial assistance; rather, as discussed more fully below, they contend plaintiff is not "otherwise qualified" to participate in the roommate assignment program.

In the postsecondary education context, a

---

**13.** Plaintiff's personal attendant care is provided by Heartland Home Health Care Services and is paid for by Medicaid. She is visited three times each day by one of three personal attendants, all of whom are female. Each morning an attendant arrives at plaintiff's dorm room and assists her in getting out of bed, getting showered, and getting dressed and ready for classes. The morning visit lasts roughly one hour; plaintiff and the attendant spend about half this time in the dorm room and the remainder of the visit is spent down the hall in the restroom. Each afternoon an attendant arrives to take plaintiff to the restroom; this visit lasts roughly fifteen minutes. Each evening an attendant arrives and assists plaintiff into her night clothes, takes her to the restroom, helps her into bed and plugs her

wheelchair in for recharging. The evening visit lasts twenty to thirty minutes.

**14.** Because the relevant portion of the ADA did not become effective until January 26, 1992, plaintiff's ADA claim is limited to the alleged discrimination occurring after that date.

**15.** The statute defines "program or activity" as: all of the operations of ... a college, university, or other postsecondary institution, or a public system of higher education.... 29 U.S.C. § 794(b)(2)(A). Therefore, UNL's practice of randomly assigning roommates to students requesting double rooms is properly considered a "program or activity" within the meaning of the Rehabilitation Act.

"qualified" handicapped person[16] is defined as one who:

> meets the academic and technical standards requisite to admission or participation in the recipient's education program or activity.

45 C.F.R. § 84.3(k)(3). The "technical standards" which must be met in order to be "qualified" refer to "all nonacademic admissions criteria that are essential to participation in the program in question." 45 C.F.R. Pt. 84, App. A at 380. Thus, under the Rehabilitation Act, a handicapped individual is "otherwise qualified" to participate in a postsecondary program or activity so long as he or she meets the academic and nonacademic admissions criteria that are essential for participation in the program.

■ The evidence showed the only academic requirement for participation in the roommate assignment program is admission to the university. Plaintiff has been admitted to the university and was so admitted at the times she requested an assigned roommate. The evidence showed the only nonacademic criteria essential for participation in the roommate assignment program is submission of a completed residence hall contract application requesting a double room and not specifying a particular roommate. Plaintiff submitted completed residence hall contract applications for both the 1991–92 and the 1992–93 academic years, both times requesting a double room and indicating a preference for a nonsmoking roommate.

Thus, having been admitted to the university and having submitted residence housing contract applications requesting a double room, plaintiff has met all the essential academic and nonacademic requirements necessary to be randomly assigned a roommate and is "qualified" under the Rehabilitation Act to participate in the roommate assignment program.

The Americans with Disabilities Act of 1990 provides in relevant part:

> no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132.[17] Cerebral palsy is recognized as a disability under the ADA. *See* 28 C.F.R. § 35.104(1)(ii).

■ Although the ADA provides persons with disabilities with the same rights and remedies as provided under the Rehabilitation Act, *see* 42 U.S.C. § 12133, the ADA is not limited to programs receiving federal funding, but rather applies to *all* public entities. 28 C.F.R. Pt. 35, App. A at 429. The term "public entity" includes States and any department, agency or other instrumentality of a State. 42 U.S.C. § 12131(1)(A) and (B). The University of Nebraska was established by the Nebraska Legislature as a state institution, *Neb.Rev.Stat.* § 85–101 (Reissue 1987)[18], and properly is considered a "public

---

16. The regulations explain why the term "qualified handicapped person" is used in the regulations rather than the statutory term "otherwise qualified" handicapped person:

> The Department believes that the omission of the word "otherwise" is necessary in order to comport with the intent of the statute because, read literally, "otherwise" qualified handicapped persons include persons who are qualified except for their handicap, rather than in spite of their handicap. Under such a literal reading, a blind person possessing all the qualifications for driving a bus except sight could be said to be "otherwise qualified" for the job of driving. Clearly, such a result was not intended by Congress. In all other respects, the terms "qualified" and "otherwise qualified" are intended to be interchangeable.

45 C.F.R. Pt. 84, App. A at 379.

17. The regulations explain that use of the term "disability" instead of "handicap" represents an effort to use currently acceptable terminology:

> As with racial and ethnic epithets, the choice of terms to apply to a person with a disability is overlaid with stereotypes, patronizing attitudes, and other emotional connotations. Many individuals with disabilities, and organizations representing such individuals, object to the use of such terms as "handicapped person" or "the handicapped." ... In enacting the Americans with Disabilities Act, Congress concluded that it was important for the current legislation to use terminology most in line with the sensibilities of most Americans with disabilities. No change in definition or substance is intended nor should one be attributed to this change in phraseology.

28 C.F.R. Pt. 35, App. A at 432.

18. The University of Nebraska is governed by the defendant Board of Regents, a board comprised

entity" within the meaning of the ADA. *Cf. Petersen v. University of Wisconsin Board of Regents*, 818 F.Supp. 1276 (W.D.Wis.1993) (University of Wisconsin is a "public entity" within the meaning of the ADA).

■ The ADA defines a "qualified" individual with a disability as one who:

> with or without reasonable modifications to rules, policies, or practices ... meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

42 U.S.C. § 12131(2). As mentioned above, the evidence showed the essential eligibility requirements for participation in the roommate assignment program are: (1) admission to the university; and (2) submission of a completed residence hall contract application requesting a double room but not specifying a particular roommate. There is no dispute that plaintiff met these eligibility requirements. Thus, she is "qualified" under the ADA to participate in the roommate assignment program.

C. *Other Eligibility Criteria*

Defendants argue, however, that plaintiff is not qualified under either the Rehabilitation Act or the ADA to participate in the roommate assignment program because:

> her disability requires her to use more space than allotted to a double room occupant and to have attendant care visits at least three times a day, thereby impinging on the physical space and solitude her roommate might otherwise be able to enjoy were it not for the plaintiff's medical needs.

(Defendant's Trial Brief at 6). Defendants' argument essentially implies that, in addition to being admitted to the university and submitting a proper residence hall contract application, there are two additional, implied eligibility requirements which must be met

before a student can be considered "qualified" to be assigned a roommate: (1) the student must not use more space than allotted to a double room occupant (presumably half the room), and (2) the student must not routinely have three or more visitors per day. Those who do not meet these additional eligibility requirements, defendants suggest, are not qualified to participate in the roommate assignment program.

The ADA prohibits the utilization of eligibility criteria that:

> screen out or tend to screen out ... any class of individuals with disabilities from fully enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered.

28 C.F.R. § 35.130(b)(8).[19] Therefore, I shall consider the additional eligibility requirements advanced by defendants to determine whether they are "necessary" to the roommate assignment program, 28 C.F.R. § 35.130(b)(8), and can properly be considered "essential" eligibility requirements, 42 U.S.C. § 12131(2); 45 C.F.R. Pt. 84, App. A at 380, which must be met in order to be qualified to participate in the roommate assignment program.[20]

1. *Equal Space Utilization*

■ Defendants suggest that to be "qualified" to participate in the roommate assignment program a student must not utilize more than half the space in the room. For the reasons discussed below I conclude this is not an "essential" eligibility requirement under either the ADA or the Rehabilitation Act.

■ First, although defendants suggest that students using wheelchairs utilize more physical space in a double room than nondisabled students, I cannot conclude from the evidence presented that plaintiff actually utilizes more than half of the space in the

---

of eight publicly elected individuals. *Neb.Rev. Stat.* § 85–103 (Reissue 1987).

**19.** Likewise, the Rehabilitation Act prohibits the utilization of criteria that "have the effect of subjecting qualified handicapped persons to discrimination on the basis of handicap." 45 C.F.R. § 84.4(b)(4).

**20.** The regulations do not offer clarification regarding the meaning of "essential eligibility requirements" due to the variety of situations in which an individual's qualifications will be at issue. *See* 28 C.F.R. pt. 35, App. A at 436.

double room she has been assigned, or that the amount of space she does use would unnecessarily impinge upon an assigned roommate's physical space. Moreover, even if the evidence had shown that plaintiff utilized more than half the space in the room, this is not something defendants knew prior to refusing her request to assign her a roommate, as no individualized inquiry was conducted to determine the amount, size or location of the equipment used by plaintiff. Defendants simply made an assumption that because she uses a wheelchair she will utilize more than half the space in the dormitory room.[21] The ADA prohibits using assumptions of this sort rather than facts and conclusions gleaned from individualized inquiry:

> [The provisions of the ADA] are intended to prohibit exclusion and segregation of individuals with disabilities ... based on, among other things, presumptions, patronizing attitudes, fears, and stereotypes about individuals with disabilities. Consistent with these standards, public entities are required to ensure their actions are based on facts applicable to individuals and not on presumptions as to what a class of individuals with disabilities can or cannot do.

28 C.F.R. Pt. 35, App. A at 439. Defendants' assumption that plaintiff's use of a wheelchair causes her to utilize more than half the space in a dormitory room falls far short of the individualized assessment that is required by the ADA. *See also Anderson v. Little League Baseball, Inc.*, 794 F.Supp. 342 (D.Ariz.1992) (blanket policy of prohibiting coaches in wheelchairs from being on the field violates the ADA; baseball league needs to make individualized assessments).

Second, although the university purports to be concerned about the amount of dormitory room space utilized by students in wheelchairs, the challenged policy does not prohibit students using wheelchairs from being assigned roommates so long as the students do not also require attendant care. Defendants explain they do not apply the challenged policy to these students because they "expect the roommate to yield some to the needs of the other roommate for slightly more physical space. The roommates must, after all, share the room with each other." (Defendants' Trial Brief at 6–7). The university allows students who use wheelchairs but do not require attendant care to participate in the roommate assignment program; this fact effectively undermines the contention that plaintiff cannot be assigned a roommate because her wheelchair utilizes too much physical space.

Third, it is important to note that defendants' concern over equity in the amount of physical space utilized by each roommate is not a concern generally applied to nondisabled students. There is no requirement, for instance, that roommates use only half the space in a double room; rather, students are allowed—indeed encouraged—to arrange and decorate their room how ever they choose. *See* exhibit 6 at 6; exhibit 7 at 8. There are no limitations placed on the amount of additional furniture, permissible appliances or personal property a student can bring from home to use in his or her dormitory room.[22] Defendant Zatechka testified that the university does not police how much personal property a roommate brings in, and would become aware that a particular student was dominating room space only if the other roommate complained to housing staff. Absent evidence that defendants actually re-

---

21. At trial defendants produced an exhibit, a mechanical drawing, showing the radius space needed to turn a wheelchair in a typical dormitory room. The exhibit demonstrated that more than half of the available floor space may be necessary to accommodate turning around in a wheelchair; however, this exhibit was not created as an individual assessment of plaintiff's space needs prior to excluding her from the roommate assignment program.

22. Although there are no limitations placed on the amount of property a student may bring from

home, there are some limitations regarding the *type* of property which can be brought into the dormitories. Due to construction limitations students may not have waterbeds, jacuzzis or aquariums larger than 55 gallons in their rooms. Refrigerators, although allowed, can be no larger than 5.0 cubic feet. For health and safety reasons the university does not allow students to use hot plates or electric skillets for cooking, but microwaves are permitted. *See* Exhibit 6 at 6–7; exhibit 7 at 7–8.

quire dormitory room space to be evenly divided between roommates and actively enforce such a requirement, I cannot conclude that it is an "essential" eligibility requirement that a student not utilize more than half the floor space in the room.

In light of the foregoing, I conclude this particular eligibility requirement—that students use no more than half the space in a room—is not "necessary" to the roommate assignment program and cannot properly be considered an "essential" eligibility requirement which a student must meet in order to be qualified to participate in the program. If equal space utilization were necessary to the program, one would expect the university to have and enforce a formal requirement that all roommates divide room space equally; it does neither. Students without disabilities are allowed to participate in the roommate assignment program regardless of the amount of space they utilize in the room. Furthermore, the fact that defendants allow students in wheelchairs to participate in the roommate assignment program (so long as they do not require attendant care), without inquiry into or concern over the amount of room space the students utilize, illustrates that equal space utilization is not paramount when determining roommate eligibility, and suggests that this additional "requirement" is artificial.

### 2. *Personal Attendant Visits*

■ Defendants next suggest that plaintiff is not "qualified" to participate in the roommate assignment program because she must be visited three times daily by a personal attendant and it would be unfair, defendants argue, to ask an assigned roommate to endure these daily intrusions. Defendants imply by this argument that to be "qualified" to participate in the roommate assignment program plaintiff cannot receive frequent daily visitors which might disrupt her roommate's solitude. As discussed below, given the nature of dormitory living and the fact that students without disabilities are allowed to participate in the roommate assignment program regardless of the number or frequency of daily visitors, I conclude this is not "necessary" to the roommate assignment program

and not an "essential" eligibility requirement under either the ADA or the Rehabilitation Act.

First, I note that the evidence in this case did not indicate that plaintiff's personal attendant visits are unusually disruptive. Two of the three daily visits are relatively brief, and during a good portion of each visit plaintiff and her personal attendant are not even in the room. The daily visits are scheduled, predictable, and amount to nothing more than assisting plaintiff in the daily routine of dressing, showering and toileting—things that all roommates do. No medical care is provided during the visits, and there is no evidence of any reason why the roommate could not remain in the room during the entire visit if she wished.

Second, to the extent the personal attendant visits are disruptive, the disruptions are not of the sort unique to roommates with disabilities, but rather are common disruptions present in all roommate situations. For example, at trial defendants suggested the personal attendant's morning visit (which occurs at either 8:00 or 9:00 a.m. depending on the day of the week) might disturb a roommate who wished to sleep later. While I do not doubt that this could happen, the same problem arises regardless of whether the roommate has a disability. It is not unusual for roommates to awaken and retire at different times due to class schedules or personal preference, and the nature of dormitory living requires that roommates be tolerant of each other's sleeping habits and accept the fact that they may not always operate on identical schedules. While this may be frustrating, it is a frustration shared by all roommates, not merely roommates assigned to live with students who have disabilities. All roommates, with or without disabilities, can awaken one another by being the first to rise, shower and dress for classes; the fact that plaintiff engages in this activity with the help of a personal attendant, while unusual, has not been shown to materially alter the nature of this common disruption.

Likewise, interruptions caused by frequent visitors are not unique to students who have disabilities. The argument that it is unfair to require an assigned roommate to tolerate

frequent attendant care visits would carry more weight if students were not generally required to tolerate frequent visitors; however, the evidence shows that Selleck hall has 24-hour unlimited visitation, and interruptions caused by frequent visitors are quite common. In fact, one of the most frequent roommate complaints received by the housing office is that visitors are present in the room to such an extent that the complaining roommate feels he or she has lost control over his or her privacy.[23] In short, all roommates, whether they have a disability or not, are confronted to some extent with frequent visitors that disrupt their solitude.[24] Frequent daily visits do not uniformly disqualify students without disabilities from participation in the roommate assignment program, and they ought not disqualify plaintiff.[25]

Nevertheless, defendants attempt to distinguish the type of intrusion occasioned by attendant care visits from what they term "typical" intrusions encountered by roommates. Defendants suggest that while problems stemming from typical intrusions can be resolved through mutual compromise, plaintiff is not in a position to compromise when it comes to her personal attendant needs and an assigned roommate would be forced to constantly subordinate her interests to accommodate plaintiff's disability. The evidence does not support this argument.

Although plaintiff cannot agree to forgo attendant care altogether (an option which could hardly be termed a compromise), she testified there is some degree of flexibility as to when and where the visits take place.

Plaintiff is willing, for example, to modify the times at which the personal attendant arrives so her roommate is less likely to be disturbed by the visit. She is also willing to reduce the amount of time the personal attendant spends in the room by dressing in the restroom, and is willing to have the personal attendant meet her in the restroom for the afternoon visit, thereby effectively limiting the room visits to two per day. It is evident that, should an assigned roommate be disturbed or inconvenienced by the attendant care visits, plaintiff is able and willing to compromise just as she would be with more typical intrusions.

In light of the foregoing, I conclude this particular implied eligibility requirement—that students not receive frequent daily visitors which might disrupt their roommate's solitude—is not necessary to the roommate assignment program and cannot properly be considered an "essential" eligibility requirement which a student must meet in order to be qualified to participate in the program.

Thus, neither of the additional implied "requirements" advanced by defendants can be considered necessary or essential requirements within the meaning of the ADA and the Rehabilitation Act. If these additional requirements were actually intended to screen out undesirable roommate candidates who use too much space or who have frequent daily visitors, then one would expect to see the requirements applied to all students requesting an assigned roommate; they are not. The fact that these additional eligibility requirements are not applied to all students indicates the additional requirements are not

**23.** It may be that a roommate assigned to plaintiff would have more, rather than less, control over their solitude because the roommate would know in advance when to expect the attendant and could plan accordingly. Not all roommates have the luxury of knowing when to expect visitors or how long they will stay.

**24.** The university expects that roommates will tolerate each other's visitors and compromise when necessary to accommodate each other's needs. Should the interruptions become intolerable and the roommates unable to work out an agreeable arrangement, the university has a grievance procedure available to work out any roommate differences; these procedures are available to all students regardless of disability.

**25.** It is important to note this is one person's case. I recognize there may be situations where a student's personal attendant care visits could be exceptionally inconvenient and intrusive due to the type of attendant care required or the length and frequency of the visits, and perhaps, following an individualized inquiry, it would be permissible under those circumstances for the university to refuse to assign a roommate to such a student. However, this is not such a case. The nature, timing and duration of the personal attendant visits in this instance are not remarkably different from those interruptions to which a student without a disability would subject his or her roommate on a daily basis.

"essential" to the roommate assignment program, but rather were advanced by defendants in an attempt to legitimize the policy of excluding students who have disabilities from the roommate assignment program.

The only "essential" eligibility requirements for participation in the roommate assignment program are admission to the university and submission of a completed residence hall contract application requesting a double room but not specifying a particular roommate. Because plaintiff met both these eligibility requirements, she is a "qualified individual with handicaps" within the meaning of the Rehabilitation Act and a "qualified individual with a disability" within the meaning of the ADA.

### D. Exclusion and Accommodation

■ "Qualified" individuals under the Rehabilitation Act and the ADA cannot be excluded from participation in the roommate assignment program by reason of their disability. 29 U.S.C. § 794(a); 42 U.S.C. § 12132. In this instance, the only reason plaintiff has not been allowed to participate in the roommate assignment program is because UNL has a policy prohibiting the assignment of roommates to students with disabilities who require personal attendant care. Under the circumstances, this blanket policy violates both the Rehabilitation Act and the ADA.

■ I recognize that the policy of requiring students with disabilities to live in single rooms may have been adopted as an accommodation to students with disabilities who were uncomfortable having an assigned roommate present during attendant care visits. However, nothing in the Rehabilitation Act or the ADA requires that plaintiff accept such accommodations. See 45 C.F.R. § 84.-4(b)(3) and 28 C.F.R. § 35.130(e)(1). Even where special accommodations have been

made, qualified individuals with disabilities must be given the option to participate in regular programs if they choose. See 45 C.F.R. Pt. 84, App. A at 380; 28 C.F.R. Pt. 35, App. A at 439, 440. As explained in the regulations:

> Even when separate programs are permitted, individuals with disabilities cannot be denied the opportunity to participate in programs that are not separate or different. This is an important and overarching principle of the Americans with Disabilities Act. Separate, special or different programs that are designed to provide a benefit to persons with disabilities cannot be used to restrict the participation of persons with disabilities in general, integrated activities. . . . For example, a person who is blind may wish to decline participating in a special museum tour that allows persons to touch sculptures in an exhibit and instead tour the exhibit at his or her own pace with the museum's recorded tour. Modified participation for persons with disabilities must be a choice, not a requirement.

28 C.F.R. Pt. 35, App. A at 440. Thus, although the university has set aside a group of double rooms to be used as single rooms by students with disabilities who require attendant care, plaintiff cannot be required to accept such accommodations simply because they exist. Instead, so long as she is qualified, she must be given the option of participating in the regular roommate assignment program. Because the challenged policy forecloses this option to plaintiff, it runs afoul of both the Rehabilitation Act and the ADA.[26]

The defendants argued that the policy exists because the university does not want to "require" students without disabilities to room with students who have disabilities and require attendant care, perceiving such a room assignment to be somehow "unfair" to the students without disabilities.[27] Yet such

**26.** Furthermore, I note defendants neither argued, nor did the evidence indicate, that assigning plaintiff a roommate would fundamentally alter the nature of the roommate assignment program or cause the university undue financial or administrative burden. 28 C.F.R. § 35.-150(a)(3) (public entity is not required to "take any action that it can demonstrate would result in a fundamental alteration in the nature of a

service, program or activity or in undue financial or administrative burdens.")

**27.** Although defendants frequently refer to assigned roommates as "involuntary" roommates, this term is a misnomer. The only students who are assigned roommates are those who have requested a double room but not specified a particular individual with whom they would like to

a policy fosters the very attitudes and stereotypes about individuals with disabilities that the ADA was designed to eliminate. *See* 42 U.S.C. § 12101(a).

■ The ADA's Findings and Purposes illustrate that Congress, in enacting the statute, aimed to bring people with disabilities into society's mainstream, to cause the kinds of interaction which might facilitate recognition of the true equality of human worth as between individuals—regardless of disabilities. In contrast, the university's policy at issue here of excluding plaintiff from the roommate assignment program, how ever well intentioned it may have been, sanctions the attitude that students with disabilities are less desirable and suggests that others should not be required to live with them. Such standoffishness places less value on the human worth of individuals with disabilities—because of their disabilities. As implemented, the policy unnecessarily separates students with disabilities from those without disabilities and thus strikes at the essence of the ADA and specifically violates the statute's stated purpose "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1).

## III. *Relief*

Plaintiff has requested declaratory, injunctive and monetary relief for violation of her rights under the Rehabilitation Act and the ADA. She also requests an award of costs and attorney fees. I conclude plaintiff is entitled to the relief she seeks, as set forth below.

### A. *Injunctive relief*

■ The present policy of prohibiting students who have disabilities and require attendant care from participating in the roommate assignment program, as applied to plaintiff, violates both the Rehabilitation Act and the ADA. Accordingly, the University of Nebraska will be required to amend its policy to allow plaintiff the choice of either rooming alone or participating in the roommate assignment program. Should plaintiff return to the UNL this fall to attend classes, and should she submit a completed residence housing contract application for the 1993–94 academic year, she must be assigned a roommate using the same procedures applied to other students.[28]

### B. *Compensatory damages*

■ Plaintiff has requested compensatory damages for the feelings of isolation and segregation she experienced as a result of the university's failure to assign her a roommate. The parties have stipulated that plaintiff suffered no physical injury as a result of these feelings and that her compensatory damages do not exceed $5,000.00. (Filing 29). Because the Eighth Circuit Court of Appeals has held that compensatory damages are available for violations of § 504 of the Rehabilitation Act, *see Miener v. State of Missouri,* 673 F.2d 969, 978 (8th Cir.), *cert. denied* 459 U.S. 909, 103 S.Ct. 215, 74 L.Ed.2d 171 (1982), plaintiff is entitled to seek such damages.[29]

---

live—in essence asking that the university assign them a roommate. As such, all assigned roommates have voluntarily agreed to be assigned to whomever the university chooses for them. Despite defendants' word choice, there would be nothing "involuntary" about being assigned to room with plaintiff, or anyone else.

**28.** Of course, she should be assigned a roommate only in the event she requests a double room and does not specify a particular individual with whom she would like to room.

**29.** *See also Smith v. Robinson,* 468 U.S. 992, 104 S.Ct. 3457, 82 L.Ed.2d 746, n. 24 (1984) (recognizing there is some confusion among the circuit courts as to the availability of damages under

§ 504 of the Rehabilitation Act, and, without expressing an opinion on the matter, noting that courts generally agree damages are available for violations of § 504). Additionally, in this instance, the state is not immune under the Eleventh Amendment from such a damages award. Section 794a(a)(2) of Title 29 provides that the remedies set forth in 42 U.S.C. § 2000d et seq. for violations of Title VI are available for violations of § 504 of the Rehabilitation Act. Section 2000d–7 of Title 42 provides that:

A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of. section 794 of Title 29.... In a suit against a State for a violation of [§ 504 of the Rehabilitation Act], remedies (including

The evidence showed that defendants' refusal to assign plaintiff a roommate, combined with the approach taken in attempting to persuade students to agree to be her roommate, made her feel isolated and stigmatized. As a result of these feelings, I conclude she is entitled to compensatory damages in the amount of $1,000.00.[30]

### C. *Attorneys' fees and costs*

██ Plaintiff has requested she be awarded costs and attorneys' fees in this matter. I conclude she is entitled to such relief under 42 U.S.C. § 12205 and 29 U.S.C. § 794a(b). Therefore, plaintiff will be given an opportunity to file her application for fees and expenses specifically documenting the amount of such costs and fees in accordance with the guidelines of the Local Rules.

## JUDGMENT

**IT IS ORDERED**, in accordance with the memorandum of decision filed this day, judgment hereby is entered as follows:

1. With respect to plaintiff's claims under § 504 of the Rehabilitation Act and the Americans with Disabilities Act, for plaintiff and against defendants, and each of them.

2. The policy of the defendants in prohibiting plaintiff from participation in the random roommate assignment program at UNL is declared to violate both the Rehabilitation Act and the ADA, as applied to plaintiff.

---

remedies both at law and in equity) are available for such a violation to the same extent as such remedies are available for such a violation in the suit against any public or private entity other than a State.
42 U.S.C. § 2000d–7(a)(1) and (2).

**30.** It is unclear whether compensatory damages are available to remedy discrimination by a public entity under the ADA. The relevant ADA section provides that:

The remedies, procedures, and rights set forth in section 794a of Title 29 [the Rehabilitation Act] shall be the remedies, procedures, and rights this subchapter provides to any person alleging discrimination on the basis of disability in violation of section 12132 of this title. 42 U.S.C. § 12133. Section 794a of Title 29—which sets forth the remedies for violations of § 501 (employment discrimination) and § 504 (discrimination by recipient of federal funding) of the Rehabilitation Act—does not specifically

---

3. The defendants, their agents, successors and assigns are enjoined from further prohibition of the plaintiff from participating in the random roommate assignment program at UNL.

4. Plaintiff is awarded compensatory damages in the amount of $1,000.00 under § 504 of the Rehabilitation Act, plus costs and attorney's fees to be determined in accordance with the accompanying order. Said award is against the defendants jointly and severally, and as against defendants Spanier and Zatechka, in their official capacities only.

---

provide for compensatory damages. Thus, although courts have found that compensatory damages are available for violations of § 504 of the Rehabilitation Act, *see, e.g., Miener v. State of Missouri, supra,* such a remedy is not specifically "set forth in section 794a of Title 29" and it is unclear whether the judicially-created damages remedy would be available for violations of the ADA. Furthermore, although the Civil Rights Act of 1991 made compensatory damages available for intentional employment discrimination under § 501 of the Rehabilitation Act and § 102 of the ADA (42 U.S.C. § 12112), *see* 42 U.S.C. § 1981a, the 1991 Act did not attempt to modify the damages available for violations of § 504 of the Rehabilitation Act or § 202 of the ADA (discrimination by public entity on basis of disability). Nevertheless, because the Eighth Circuit has held compensatory damages are available for violations of § 504 of the Rehabilitation Act, I need not determine whether such damages are similarly available under the relevant portions of the ADA.