U.S. EQUAL EMPLOYMENT OPPOR-
TUNITY COMMISSION, Plaintiff,

v.

AIC SECURITY INVESTIGATION, LTD.;
AIC International Ltd. and Ruth
Vrdolyak, Defendants.

No. 92 C 7330.

United States District Court,
N.D. Illinois, E.D.

March 5, 1993.

Jean P. Kamp, Supervisory Trial Atty.,
Allison J. Nichol, Elaine M. Chaney, Trial
Attys. and John C. Hendrickson, Regional
Atty., for E.E.O.C.

Edward Glennon, Thomas E. Glennon and
Deborah Regan of Lindquist and Vennum,
Minneapolis, MN, for Charles H. Wessel.

James B. Sherman and Frank A. Gumina
of Wessels and Pautsch, Milwaukee, WI, for
AIC Sec. Investigations, Ltd. and Ruth
Vrdolyak.

### ORDER

GUZMAN, United States Magistrate
Judge.

Pending is Defendant's, AIC Security In-
vestigations, LTD., AIC INTERNATION-
AL, LTD., and Ruth Vrdolyak's, (collectively
"AIC") motion for summary judgment. For
the reasons listed below it is hereby ordered
that this motion be denied.

### BACKGROUND FACTS

This action is brought pursuant to Title I
of the Americans with Disabilities Act of
1990, 42 U.S.C. § 12111 *et seq.*, and Title I of
the Civil Rights Act of 1991, 42 U.S.C.
§ 1981a. The EEOC and the Intervening
Plaintiff, Charles Wessel ("Wessel"), allege
that AIC discriminated against Wessel on the
basis of his disability, terminal cancer, by
discharging him from his position as Execu-
tive Director at AIC.

AIC is a wholly owned subsidiary of AIC
International. Ruth Vrdolyak became the
sole shareholder of AIC International on

June 6, 1992. Prior to June 6, 1992, the sole owner of AIC was Victor Vrdolyak. AIC has been and is currently engaged in the business of providing commercial security services, hardware, and investigative services to customers in the Chicago area. There are two distinct entities within AIC International, AIC Security Investigations, Ltd., the security guard division, and AIC Security Systems, the hardware division. The security guard business, as compared to other service industries, is highly competitive; it is a dynamic, unpredictable business that requires continual and prompt adaptations to the clients' needs as they arise.

Wessel was hired by Victor Vrdolyak in February 1986 and reported to Victor Vrdolyak until his death on June 6, 1992, and to David Pack, President of AIC International, until Pack's termination on July 6, 1992. In his position of Executive Director, Charles Wessel was the Chief Executive of the security guard division. The Executive Director position which Wessel held was at all times during his employment the highest management position in AIC, and accordingly, Wessel was responsible for the overall management and profitability of AIC. The position of Executive Director required, as an essential function, overall management and direction of the 300 plus employees of the company, from all management level personnel to watch commanders and ultimately hundreds of security guards employed by AIC. This position also required, as an essential function, dealing with labor unions, supervising investigations, tracking litigation AIC was involved in, the development of policy, site walk throughs, handling labors matters, establishing price rates and monitoring and disciplining subordinates.

Wessel is a widely recognized leader in the security guard industry, having worked in the industry for approximately thirty years. He is licensed as a private detective and a private security contractor by the State of Illinois and the State of Florida. Wessel is also a member of, and has served on the Board of numerous professional associations within the security industry, including the Associated Detectives of Illinois, the Associated Guard and Patrol Agencies, Inc., and the Special Agents Association. In addition, Wessel served as the principal drafter of the Illinois licensing act for private investigators and security guards.

When Wessel started with AIC, he had emphysema caused by smoking 2–4 packs of cigarettes a day for approximately 25 years and 8–10 cigars a day for 15 years, and he had a back injury rendering him 20 percent disabled under his V.A. disability. In June, 1987, Wessel was diagnosed with lung cancer. Following surgery and recuperation Wessel returned to work at AIC. In July, 1991, Wessel suffered pneumothorax during a biopsy and went into respiratory arrest. Thereafter, Wessel was again diagnosed with lung cancer, this time affecting his right lung. Surgery was performed, and following a period of treatment and recuperation, Wessel again returned to work as Executive Director of AIC. In April, 1992, Wessel was initially diagnosed in April, 1992 with 2 tumors, and subsequently, in June, 1992, with 2 additional tumors, for a total of 4. Wessel's doctors considered his condition to be terminal and he was told sometime in April, 1992 that he had six to twelve months to live. Wessel has received radiation treatments since this diagnosis but these treatments have been palliative, that is, not for the purpose of a cure, but to prolong and assure some quality of Wessel's life.

Wessel continued to work at AIC throughout the course of the treatments, although on the days when the radiation treatments were scheduled in the afternoon, he had to leave work at approximately 2:30 p.m. The amount of time Wessel was absent from work is disputed. The EEOC and Wessel allege that Wessel had two treatments in July of 1992 and he did not miss a full day of work on either of those two days nor did he miss any other work in July of 1992. AIC claims that he missed 15 workdays in April and May of 1992, several days in June, 1992 and 2 days in July, 1992. Further, between July 29th and August 13th, 1991 Wessel missed 16 days of work when he experienced a pneumothorax during his routine one-day biopsy. He missed 2 half days and one full day in August of 1991, and he missed approximately 33 days between October 3rd and November

4th, 1991 for surgery to remove his right lung. Dr. Nomanbhoy, Wessel's primary treating physician, restricted Wessel's driving because of lesions in the occipital lobe of the brain and in December of 1992 Wessel experienced seizures. Dr. Petras, a radiation oncologist treating Wessel, informed Ruth Vrdolyak in a telephone conversation that Wessel had been advised not to drive. Larry Roberts, the Executive Vice President of AIC's Systems Division, offered Wessel a driver which Wessel refused.

On or about June 10, 1992, Mrs. Vrdolyak hired Beverly Kay to work for AIC. On July 28, 1992, Kay had a meeting with Wessel. During that meeting, Kay apprised Wessel that Mrs. Vrdolyak had decided that it was time for Wessel to retire. On July 30, 1992, Kay advised Wessel by telephone that his employment at AIC was terminated effective July 31, 1992. Wessel was paid through July 31, 1992. Prior to his termination from AIC, Wessel was never subject to any warnings relating to his performance, his attendance, or any disciplinary action.

## DISCUSSION

The United States Supreme Court set forth the following principles to be applied in ruling on a motion for summary judgment:

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issues as to any material fact and that the moving party is entitled to a judgment as a matter of law." By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there is no genuine issue of material fact.

As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted. This materiality inquiry is independent of and separate from the question of the incorporation of the evidentiary standard into the summary judgment determination. That is, while the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs. Any proof or evidentiary requirements imposed by the substantive law are not germane to this inquiry, since materiality is only a criterion or categorizing of factual disputes in their relation to the legal elements of the claim and not a criterion for evaluating the evidentiary underpinnings of those disputes.

More important for present purpose summary judgment will not lie if the dispute about a material is "genuine." that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). *See also Celotex Corporation v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The Court went on to say that "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505.

When a properly supported motion for summary judgment is made, the adverse party "must set forth specific facts showing that there is a genuine issue for trial." *Id.* There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, or is not more than a scintilla, a summary judgment may be granted. The substantive evidentiary standard of proof that would apply at a trial on the merits applies on a motion for summary judgment. *Id.* at 251–53, 106 S.Ct. at 2512.

Further, Local Rule 12(M) requires a party opposing a motion for summary judgment

to file, in addition to the evidentiary materials allowed by Rule 56(e), a response listing the factual assertions by the movant with which the opponent disagrees. *Bell, Boyd, & Lloyd v. Tapy,* 896 F.2d 1101, 1102 (7th Cir.1990). The list must be supported by specific references to the evidentiary materials relied on and must set forth any additional facts that require denial of summary judgment, also supported by specific references in the record. Any facts asserted by the movant and not contradicted in the manner specified by the Rule are deemed admitted pursuant to Local Rule 12(L) and (M). *Id.,* at 1102.

Therefore, this court must determine whether the EEOC has offered any evidence to create a genuine issue of fact as to AIC's summary judgment claim against the EEOC and Wessel. In doing so, this court will examine plaintiff's evidence in its most favorable light.

### DISPUTED ISSUES OF FACT REMAIN AS TO WHETHER WESSEL WAS ABLE TO PERFORM THE ESSENTIAL FUNCTIONS OF HIS JOB

■ AIC first contends that Wessel cannot meet his initial burden of proof that he was a qualified individual with a disability. In particular, AIC argues that regular, predictable, full-time attendance was an essential function of the position of Executive Director which Wessel could not perform regardless of any reasonable accommodations.

To support this contention AIC points to the deposition testimony of Wessel in which Wessel stated as follows:

Q. .... When you went to work on a given day, did you typically know everything that, every issue that you were going to confront that day, or did things come up a daily basis?

A. Absolutely, I did not know what was going to come up. We're in a business that is subject to surprises. Nothing is routine. There is no day-to-day "do this," "do that."

Q. Hectic pace, your workplace?

A. Sometimes

Q. Need for quick decisions?

A. Often.

Q. Is the industry highly competitive in your estimation?

A. Probably one of the most highly competitive service industries.

Likewise, Wessel testified that a "normal" workday had been 8:00 to 8:30 a.m. to 6:00 to 6:30 p.m. at night, but this changed significantly in 1991 and 1992. AIC also points to Wessel's testimony regarding the search for his replacement in which Wessel stated: "No, Ed was one who came in at five to ten after 9 and left at five to ten before 5. And then once I told him that I was terminal and he'd either better get in shape or they were going to look elsewhere, he did make an effort. This testimony AIC argues, clearly indicates that AIC, and indeed, Wessel himself, would exclude individuals from any consideration for the Executive Director position unless they could put in the necessary long hours.

AIC claims that during the last 12 months of his employment at AIC, Wessel was absent approximately 25 percent of the time. In consideration of the responsibilities of Executive Director and the heavy day-to-day demands of the Guard Division, attendance was an extremely important essential function which Wessel was unable to perform.

The EEOC's response to these arguments puts forth the counter-argument that while it is undisputed that Wessel was required to miss a certain amount of work for surgery and treatment of his cancer during his employment at AIC, there remains a genuine issue of material fact as to whether Wessel's absence resulted in his not being able to perform the essential functions of the position of Executive Director. The EEOC points to the deposition testimony of David Pack, Wessel's supervisor for all but one month of his employment, who stated the following:

Q. Did it affect the hours he put in at work?

A. No. He put in quite a few hours.

Thereafter, Pack stated that although Wessel missed time for surgery and treatment, it was no different than instances when other employees at AIC had to take time off for

surgery. In addition Pack elaborated that typically Wessel worked long hours and Saturdays and did "a ton of work at home."

Similarly, Kenneth Bartels, an AIC customer who dealt with Charles Wessel for years testified that his ability to contact Wessel at AIC did not change at all in 1992, from what it had been in prior years. Bartels further stated that whenever he needed to talk to Wessel he was able to do so up to and including 1992.

The EEOC finally argues that perhaps the most telling indication that a genuine issue of fact remains as to whether Wessel's absences, necessitated by surgery and treatment, resulted in his inability to perform the essential functions of the position of Executive Director is the complete absence of any evidence in the record that Wessel was ever advised by anyone at AIC that his lack of attendance was interfering with the performance of his duties.

The disposition of this action is, of course, controlled by Title I of the Americans with Disabilities Act ("ADA"). 42 U.S.C. § 12111, et seq. Although the ADA is relatively new law, Section 504 of the federal Rehabilitation Act of 1973, 29 U.S.C. § 794 and many state handicap laws form the basis of parallel decision which will assist with questions of law in this action. In fact, the ADA expressly contemplates that the voluminous precedent arising out of Section 504 of the Rehabilitation Act may serve as guidance for determinations involving the ADA. See, 42 U.S.A. § 12117(b).

The ADA proscribes discrimination "against a qualified individual with a disability because of the disability of such individual ..." 42 U.S.C. § 12112(a). A "qualified individual with a disability" is defined as an "individual with a disability who with or without reasonable accommodation, can perform the essential function of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

Accordingly, only those persons who are qualified—that is, able, with or without reasonable accommodation, to perform the essential functions of a particular job—may state a claim under the ADA. 42 U.S.C. § 12111(8). As the Supreme Court stated in

*School Board of Nassau County v. Arline*, 480 U.S. 273, 285, 107 S.Ct. 1123, 1129, 94 L.Ed.2d 307 (1987): "only those individuals who are both handicapped and qualified are eligible for relief." (Emphasis in Original); *cf. Overton v. Reilly*, 977 F.2d 1190, 1193 (7th Cir.1992). The burden of proving that Wessel was qualified to remain in his position as Executive Director of AIC falls on the plaintiffs. *Ristoff v. United States*, 839 F.2d 1242, 1243–44 (7th Cir.1988).

The record demonstrates that there remains a factual dispute as to whether Wessel's absences rendered him "unqualified" for purposes of the ADA. As the EEOC has argued, Pack's deposition testimony clearly indicates that he, as Wessel's immediate supervisor, was completely satisfied with Wessel's attendance and performance, despite the time that Wessel had to be absent for work for his surgery and treatment. Likewise, there is no evidence that Wessel was given notice that his attendance was unsatisfactory.

In light of these disputed facts a genuine issue remains as to whether as of July 29, 1992, Wessel was a "qualified individual with a disability" as that term is defined. To be sure, attendance is necessary to any job, but the degree of such, especially in an upper management position such as Wessel's, where a number of tasks are effectively delegated to other employees requires close scrutiny. Further, an executive such as Wessel more than likely handled a number of his business matters through customer contact, and this usually is done by phone or in person at the customer's site. Whether a phone call is made from the office, a car phone, or a home is immaterial. Whether a contract is negotiated in the office or out of the office is immaterial. What is material is that the job gets done. Therefore, a genuine issue of fact remains as to whether Wessel was meeting that threshold of both attendance and regularity necessary to perform his job successfully at the time he was discharged. This is necessarily a fact intensive determination.

AIC's next argument raises the allegation that Wessel was unable to perform his job because of alleged short term memory prob-

lems. This allegation is supported by Wessel's deposition testimony that in part stated "My short-term memory is somewhat limited, but by the—an hour from now I remember everything."

AIC also contends that the people who worked with Wessel on a daily basis during his course of employment with AIC during 1992 observed Wessel exhibiting severe short-term memory loss directly related to his performance of the functions of this job as Executive Director. AIC also emphasizes that in July of 1992, Wessel was involved in a serious problem with one of AIC's largest accounts. Apparently a contract renewal was mistitled when mailed to a renewal account and in a second instance an incorrect estimate was submitted to an AIC customer. It is undisputed that if this estimate had not been corrected, it would have caused AIC an account loss.

AIC claims that in order to insure the survival of the company, Wessel's job responsibilities were being transferred to other AIC personnel as his condition deteriorated. Further, the pace of these transfers was hastened once Wessel was diagnosed in April, 1992 with inoperable brain tumors and given 6 to 12 months to live. Finally, AIC points out that Wessel upon his termination immediately became qualified for total disability Social Security benefits.

Once again, I agree with the EEOC that Mr. Wessel's alleged short-term memory loss and its effect on Mr. Wessel's qualification to perform his job as Executive Director is a disputed issue of fact. It is important to note that Wessel's own testimony was "[m]y short-term memory is somewhat limited, but the—an hour from now I remember everything." The fact that Wessel admits to some limitation of his short-term memory is not evidence of the severity of such or that the limitation had any impact on Wessel's performance. In fact, deposition testimony reveals that the lobes of Mr. Wessel's brain where the tumors were located were not the lobes where the short-term memory function takes place. Rather, the functions of balance and possibly some visual coordination had the potential to be affected. Further, AIC's contentions that "there is simply no accommoda-

tion for memory loss" is contradicted by AIC's own expert witness, Dr. Peter Lewitt who stated in his deposition that if memory is a problem, for example writing things down and keeping logical notes is one strategy to improve a deficient memory. In addition, Dr. Lewitt acknowledged that experience and expertise could also aid in overcoming memory loss. It is undisputed that Mr. Wessel has such substantial experience and expertise.

As to the two errors that AIC has alleged, Wessel acknowledges that he failed to catch both and explained that they were the result of clerical error. Wessel further indicated, and AIC does not dispute that the estimate error was rectified shortly, thereafter, and AIC did not suffer any adverse consequences, financial or otherwise. Further, AIC has failed to establish that the above errors have any connection whatsoever to short-term memory loss.

Therefore a factual question exists, as to whether Wessel's errors can lead to a finding that Wessel could not perform the essential functions of this position of Executive Director. As the EEOC has persuasively argued, if perfection is to be the standard for qualification under the ADA, very few individuals would be qualified.

As to AIC's assertion that over time, Wessel's job responsibilities were being transferred to other AIC employees because of Wessel's alleged inability to perform such, this assertion is refuted by the testimony of David Pack and Larry Roberts. Specifically, Pack stated in his affidavit that "Wessel maintained overall responsibility for all of these essential functions throughout his employment." Pack further testified that to the extent that Wessel began to delegate and transfer some of his functions to others, the reasons for the transfer were unrelated to Wessel's illness. Rather, Pack stated that he wanted Wessel to transfer his duties to others, so that Pack could promote Wessel and begin to delegate some of his own duties to Wessel. Roberts confirmed that the discussion to transfer some of Wessel's job responsibilities preceded Wessel's illness. In addition, Pack acknowledged the terminal nature of Wessel's illness, indicating that he wanted

to take advantage of Wessel's experience and knowledge for purposes of selecting and training a successor.

Finally, there is substantial evidence in the record to create a genuine issue on the question of whether Wessel could perform the essential functions of his job. AIC's audited financial's show that the profits of AIC's division under Wessel's direction increased from July 31, 1991 to July 31, 1992, while the overall profits of AIC decreased. Likewise, there is disputed evidence to refute the allegation that Wessel was unable to perform the "essential functions" of labor negotiations, supervising investigations, tracking litigation and development of policy. Therefore, there exists disputed material issues of fact and summary judgment must be denied.

## A DISPUTED ISSUE OF FACT REMAINS AS TO WHETHER WESSEL COULD NOT PERFORM HIS JOB WITHOUT RISK OF INJURY TO BOTH HIMSELF AND THE EMPLOYEES WITH WHOM HE WORKED, REGARDLESS OF ANY REASONABLE ACCOMMODATION

■ AIC's final argument contends that Wessel could not perform his job without risk to himself and others, regardless of any reasonable accommodation. This argument stems from Wessel's treating physician's recommendation that he not drive a car because of his potential to suffer a seizure. Wessel's refusal to discontinue driving, AIC argues poses a direct threat to other AIC employees, the public at large, as well as exposes to AIC to potential liability.

Direct threat is defined as "a significant risk of substantial harm to the health and safety of the individual or other that cannot be eliminated or reduced by reasonable accommodation." A "direct threat" defense is to be evaluated on a individualized assessment of the individual's present ability to safely perform the essential functions of the job. 29 C.F.R. § 1630.2(r) (emphasis added).

AIC's direct defense obviously fails for purposes of this motion. AIC cannot establish that driving was an essential function of the position of Executive Director of AIC. Therefore, any inability to drive could not serve as the basis for asserting the defense. In order to rely on a safety requirement to screen out disabled individuals the employer must demonstrate that the requirement, as applied to the individual, satisfies the direct threat standard under the ADA in order to show that the requirement is job related and consistent with business necessity. 29 C.F.R. § 1630.15.

In the instant case, AIC does not assert and cannot demonstrate that driving is an essential function of Wessel's job. Even if they had, an accommodation, i.e. alternative mode of transportation could be provided. In fact, one such accommodation was offered voluntarily by AIC prior to this lawsuit. AIC offered Wessel a driver. So the company determined of its own accord that such an accommodation was reasonable. Further, the deposition testimony of Dr. Nomanbhoy, indicates that he has on occasion initiated proceedings to have patients' licenses suspended due to their being a risk to the public at large behind the wheel. Mr. Wessel was not one of those patients.

## DISPUTED FACTS REMAIN AS TO THE MEDICAL EVIDENCE REGARDING MR. WESSEL'S CONDITION AS IT RELATES TO HIS ABILITY TO PERFORM HIS JOB

AIC in their reply brief primarily argue that the record is clear that all four physicians who are to give expert medical testimony at trial have declared Wessel unable to perform his former position of Executive Director for AIC. Allegedly this conclusive medical testimony is not disputed anywhere.

At the outset, I disagree with AIC's statement that this medical testimony is not disputed anywhere. Dr. Nomanbhoy in his deposition clearly stated that he had never observed Mr. Wessel suffering from memory problems and that up until a few weeks ago when Mr. Wessel fell he had no qualms in answering that Mr. Wessel could still perform his job. Further, as to the information that Dr. Nomanbhoy supplied to Social Security, Dr. Nomanbhoy clearly stated that this information was premised on the fact that Mr. Wessel had been fired from his job and

that he should be able to get some compensation because no one is going to hire him. Further, I don't agree that Dr. Petras has stated that Mr. Wessel was not capable of performing his job. In fact, Dr. Petras went into great detail explaining that the tumors were located in areas of the brain that did not affect mental functions. As to Dr. Lewitt and Dr. Milner's testimony the weight to be afforded to such is for the trier of fact to determine.

## CONCLUSION

For the reasons listed above, AIC's motion for summary judgment is **DENIED**.

**SO ORDERED.**