Paul WOLFORD, by his next friend, Lida MACKEY; Henry BIAS, by his next friend, Lida Mackey; and Coy Burdette, individually and on behalf of all others similarly situated, Plaintiffs

v.

Gretchen LEWIS, in her official capacity as Secretary, West Virginia Department of Health and Human Resources; Ann Stottlemyer, in her official capacity as Director, Medical Services, West Virginia Department of Health and Human Resources; Lynda G. Kramer, in her official capacity as Director, Office of Health Facilities–Licensure and Certification, Bureau of Administration and Finance, West Virginia Department of Health and Human Resources; Sandra L. Daubman, in her official capacity as Program Administrator, Office of Health Facilities–Licensure and Certification, Bureau of Administration and Finance, West Virginia Department of Health and Human Resources; and Gaston Caperton, in his official capacity as Governor of the State of West Virginia, Defendants.

No. 2:92–1151.

United States District Court,
S.D. West Virginia,
Charleston Division.

March 21, 1994.

**1126**

Daniel F. Hedges, Appalachian Research & Defense Fund, Charleston, WV, Jane Perkins, Nat. Health Law Program, Chapel Hill, NC, for plaintiffs.

Darrell V. McGraw, Jr., Thomas M. Woodward, Office of Atty. Gen., Charleston, WV, for defendants.

### MEMORANDUM ORDER

COPENHAVER, District Judge.

This matter is before the court on the plaintiffs' motion for summary judgment on the first, second, third and eighth claims set forth in their amended complaint.[1] The materials before the court consist of the parties' pleadings, stipulation of facts, stipulated exhibits, memoranda of law, supporting appendices and order of class action certification.

#### I. *Keys Amendment*

The class of plaintiffs affected by the first claim is "all present or future residents of residential board and care, personal care, and nursing homes in the State of West Virginia."[2] The class contends in general that with respect to residential board and care homes, personal care homes and nursing homes in which a substantial number of Supplemental Security Income recipients reside, the defendants have failed to establish and/or ensure the enforcement of standards required by the Keys Amendment to the Supplemental Security Income Program, 42 U.S.C. § 1382e, and regulations promulgated thereunder by the Office of Human Development Services, Department of Health and Human Services, entitled "Standard Setting Requirements for Medical and Nonmedical Facilities Where SSI Recipients Reside," 45 C.F.R. §§ 1397.1 through 1397.20 (hereinafter, HDS regulations). (Compl. at ¶ 85.)

The Keys Amendment, made effective October 1, 1977, is designed to insure that Supplemental Security Income benefits are not used to pay for substandard living arrangements. To achieve that goal, Supplemental Security Income benefits to recipients living in substandard arrangements are at a reduced rate. The Keys Amendment requires, *inter alia*, that:

(1) Each State shall establish or designate one or more State or local authorities which shall establish, maintain, and insure the enforcement of standards for any category of institutions, foster homes, or group living arrangements in which (as determined by the State) a significant number of recipients of supplemental security income benefits is residing or is likely to reside. Such standards shall be appropriate to the needs of such recipients and the

1. By agreed order entered on February 16, 1994, plaintiffs voluntarily dismissed their fourth, sixth and seventh claims. The fifth claim is not addressed in the pending motion.

2. "Residential board and care homes" are designed for three to eight persons who by reasons of physical or mental impairment are dependent on the services of others but "who are capable of self-preservation and do not require nursing care." W.Va.Code § 16–5c–2(e). "Personal

care homes" are devised for three or more physically or mentally impaired persons needing the services of others but not requiring "extensive, on-going nursing care." § 16–5C–2(d). "Nursing homes" provide care for "three or more persons who are ill or otherwise incapacitated and in need of extensive, on-going nursing care due to physical or mental impairment" or provide rehabilitation services for "persons who are convalescing from illness or incapacitation." § 16–5C–2(c).

character of the facilities involved, and shall govern such matters as admission policies, safety, sanitation, and protection of civil rights.

(2) Each State shall annually make available for public review a summary of the standards established pursuant to paragraph (1), and shall make available to any interested individual a copy of such standards, along with the procedures available in the State to insure the enforcement of such standards and a list of any waivers of such standards and any violations of such standards which have come to the attention of the authority responsible for their enforcement.

42 U.S.C. § 1382e(e)(1) & (2).

HDS regulations promulgated under the Keys Amendment require that each state designate an authority "to establish, maintain and ensure the enforcement of standards" set forth in the regulations and "assure" compliance with section 1397.20 of the regulations. 45 C.F.R. § 1397.10(b) & (d). Under section 1397.20, the designated state authority must establish standards "appropriate to the needs of the SSI recipients residing in the facilities and to the character of the facilities involved." § 1397.20(a)(1). The standards must also govern such matters as:

(i) Admission policies (including a continuous needs assessment and referral to appropriate resources);

(ii) Safety;

(iii) Sanitation (cleanliness and hygienic procedures); and

(iv) Protection of civil rights (under the United States Constitution, the Civil Rights Act of 1964, section 504 of the Rehabilitation Act of 1973, and all other relevant provisions of Federal and State laws).

§ 1397.20(a)(1)(i)–(iv).

In addition to establishing standards for the living arrangements covered by the Keys Amendment, the designated state authority must establish procedures for enforcing the standards. § 1397.20(b). The enforcement procedures must include periodic inspections, the provision of technical assistance, and use of a warning system providing a deficient facility with the opportunity to comply with required standards and residents with the opportunity to move out if the facility fails to correct its deficiencies. § 1397.20(b)(1).

The state must further establish specific time periods for: (1) a deficient facility to carry out an approved plan for correcting violations, § 1397.20(b)(2)(i); and (2) if the facility fails to comply, for informing residents and/or families and guardians in writing of standards not being met by the facility and "of the time period during which residents may relocate if they wish before the authority reports the deficient facility to the Social Security Administration." § 1397.-20(b)(2)(ii). "[A] list of approved facilities and agencies which will help them move," must also be provided. *Id.* If the facility continues to be in violation of the required standards after expiration of the time given for correcting deficiencies and allowing residents the opportunity to move, the responsible state authority must report the noncompliance to the Regional Office of the Social Security Administration so that the appropriate reduction in Supplemental Security Income benefits can be made. § 1397.20(c)(1).

HDS regulations also require the state authority to maintain records detailing each violation of a standard by a facility, § 1397.-20(d)(1)(i), and to make records available to the public showing the complete set of standards for each type of covered facility, the procedures used to ensure enforcement of the standards, and the list of facilities found in violation of a standard, § 1397.20(d)(2)(i), (ii) and (iv).

### A. *Establishment of Standards and Procedures*

The parties have stipulated that the Office of Health Facility–Licensure and Certification (hereinafter, "OHFLAC") is the authority designated by the state to establish and enforce standards for the regulation of nursing, residential board and care and personal care homes, (Stip. 7(a)), and that a significant number of Social Security Income recipients reside in those settings, (Stip. 5(a)). It is also agreed that West Virginia enacted legislation in 1988 requiring the promulgation of rules and regulations setting forth minimum

numbers and qualifications of personnel; safety and sanitation requirements; categorization of the standards into classes depending on their effect on the health, safety and welfare of the residents; assignment of numerical values based on the standard's classification to represent levels of compliance; and a system for rating facilities as part of the licensing procedure, which rating system was to be established no later than March 1, 1989. (Stip. 6 and W.Va.Code § 16–5C–5.) Nonetheless, regulations governing personal care homes have not changed significantly in over twenty years, (Stips. 7(b) & 16(a)–(b)), and regulations for residential board and care homes were not made effective until October 1, 1993, (Stip. 14(b)),[3] several months after the filing of this lawsuit on December 21, 1992.

Other portions of West Virginia's statutory scheme governing nursing, personal care and residential board and care homes impose a duty on OHFLAC to offer and sponsor education and training programs, § 16–5C–3(i), and by regulation, to establish procedures for prompt investigation of complaints of alleged violations of applicable standards, § 16–5C–8. If it is determined after investigation that the complaint has merit, OHFLAC must take appropriate disciplinary action and advise any injured party of the possibility of civil remedies. § 16–5C–8. The statute also requires homes to disclose to prospective residents in writing a list of costs which may be incurred, § 16–5C–7(a). In addition, those facilities handling money for residents must obtain a bond unless they handle "less than twenty-five dollars per patient and less than five hundred dollars for all patients in any month." § 16–5C–7(b). As part of its licensing authority,[4] OHFLAC is responsible for insuring that administrators of facilities are "qualified by training and experience," § 16–5C–6.

OHFLAC is also charged with the general duty of establishing and implementing procedures to enforce compliance with the statute and regulations issued thereunder. § 16–5C–3(n). In that respect, it has the right to inspect facilities and assess civil penalties for violation of facility standards. § 16–5C–3(k) & (m). In particular, the statute provides for at least one inspection prior to the issuance of a license and thereafter for "periodic unannounced inspections." § 16–5C–10. Reports of inspections are to be in writing, filed with OHFLAC, and list deficiencies in the facility's compliance with applicable standards. § 16–5C–10(a). A copy of the report is to be sent to the facility, together with a specified time for submitting a plan for correction of the deficiencies. *Id.* If a correction plan is not timely submitted or if the deficiencies are not corrected within the time allowed by an approved correction plan, civil penalties may be assessed or other disciplinary action taken. § 16–5C–10(b). Other disciplinary actions available include admission bans, license terminations, appointments of temporary management, and civil actions. § 16–5C–11. Copies of all inspections and other reports of facilities filed or issued by OHFLAC are to be made available for public inspection. § 16–5C–16.

### 1. *Residential Board and Care Homes*

■ With respect to the regulations established for residential board and care homes, which took effect October 1, 1993, and their conformance with the Keys Amendment and HDS regulations, it is agreed that the standards do not require individual needs assessments, (Stip. 26);[5] do not ensure referrals to appropriate services, (Stip. 28); do not contain a written procedure for informing residents and/or families and guardians of deficiencies in the facilities' standards or of time periods in which residents may relocate,

---

**3.** Plaintiffs do not claim that standards governing nursing homes are nonexistent or that they are inadequate.

**4.** OHFLAC has the responsibility for licensing nursing, personal care and residential board and care homes. (Stips. 14(c), 16(a) & 18(a).)

**5.** Defendants assert, however, that since July 13, 1993, resident assessment forms have been used when conducting complaint investigations and initial surveys and resurveys of unlicensed residential board and care homes, which assessments will identify inappropriate placements and evaluate "self-preservation" abilities. (Aff. Sandra L. Daubman, Defs.' App. 7.)

(Stip. 30); and do not assure accessibility for the handicapped (Stip. 45).

 It is further agreed that with respect to state-law requirements, they provide for a rating system, (Stip. 22); but do not adequately spell out qualifications for administrators, (Stip. 29); and do not contain minimum numbers and qualifications of personnel, (Stips. 6 & 54). In addition, the parties stipulate that prior to the institution of this action, OHFLAC did not advise injured parties of the possibility of seeking civil remedies, (Stip. 24), and that the regulations do not implement that requirement, (Stip. 36). There is no provision for technical assistance built into the regulations, although OHFLAC will respond to telephone inquires. (Stip. 46(a).) Similarly, the offering and sponsoring of educational and training programs is not addressed, (*see* Stip.Ex. 1), but it is agreed that a tele-conference was held in August 1993 covering the new regulations and procedures, (Stip. 46(b)).

In other respects, defendants contend and support with reference to the new regulations, which contentions are not disputed by plaintiffs, that the residential board and care regulations now in effect comply with the federal requirement of establishing an admission policy by defining the type of resident that residential board and care homes are authorized to admit, (Stip.Ex. 1 at § 5.3.2), and with the state-law requirement of disclosure of costs, (Stip.Ex. 1 at 5.3.3.2). It is also undisputed that the new regulations contain sections dealing with safety, sanitation and hygienic procedures and a system for classifying standards and assigning numerical values for assessing violations, (Stip.Ex. 1 at 4.10 & 4.11), although plaintiffs maintain, without specific references, that the regulations are inadequate in those areas.

Aside from contending that the defendants are in violation of federal and state law with respect to those matters which are subject to stipulation, plaintiffs claim that defendants are in violation of the federal mandate to establish standards governing the protection of civil rights because the regulations do not protect residents' privacy rights by requiring private bedrooms or, for those preferring a roommate, restricting bedroom occupancy to two persons. On that point, it is noted that the regulations limit bedroom occupancy to three residents. (Stip.Ex. 1 at 11.5.2.). Plaintiffs also claim, and a review of the new regulations discloses, that they do not mention West Virginia's statutory requirement of a bond for those facilities handling residents' monies.

It is further seen from a review of the current regulations, that after a facility is initially licensed, OHFLAC is required to conduct periodic unannounced inspections and prepare and send to the facility a written report listing any violations. (Stip.Ex. 1 at 4.6.5. and 4.6.6.) If a violation is found, the facility must submit a plan of correction within fifteen working days of receipt of the report, which plan must contain a calendar date by which time the violation will be corrected. (Stip.Ex. 1 at 4.8.1. and 4.8.3.3.) Provision is made for the assessment of civil penalties as required by statute. (Stip.Ex. 1 at 12.1.) No time period for investigating complaints is specified. There is no requirement that residents be provided with a list of facilities to which they might move if violations of standards are not corrected and there is no requirement that deficient facilities be reported to the Social Security Administration. Information concerning inspections, investigations and other reports are to be made available to the public, (Stip.Ex. 1 at 4.9.1.), but nothing requires a change in the practice, (Stip. 47), of releasing records of inspections or "deficiency statements" to the public only after an approved plan of correction is completed, which could be up to a year after a complaint is filed.

Defendants have raised no legal defense to their failure to address all federal and state requirements in the current regulations governing residential board and care homes. The court accordingly finds on the basis of the parties' stipulations and its review of the current regulations that the West Virginia Department of Health and Human Services Administrative Rules for Residential Board and Care Homes, 64 C.S.R. 65, effective October 1, 1993, are in violation of the Keys Amendment, 42 U.S.C. § 1382e, and HDS regulations governing Standard Setting Requirements for Medical and Nonmedical Fa-

cilities where Supplemental Security Income Recipients Reside, 45 C.F.R. §§ 1397.1 through 1397.20, by their failure to:

1. Establish standards governing:

a. admission policies which include continuous needs assessments and referral to appropriate resources as required by section 1397.20(a)(1)(i); and

b. protection of residents' civil rights by providing accessibility for handicapped residents as required by section 1397.20(a)(1)(iv) and its incorporation of current federal law respecting accessibility for individuals with a physical disability.

2. Establish procedures for enforcing the standards which

a. include provision of technical assistance as required by section 1397.20(b)(1)(ii); and

b. as required by section 1397.20(b)(2)(ii), specify time periods, after a deficient facility fails to correct violations, for (1) informing residents and/or families and guardians of residents of standards which the facility does not meet, and the time period during which residents may relocate, if they wish, before the deficient facility is reported to the Social Security Administration; and (2) provide residents with a list of approved facilities and agencies which will help them move.

3. Require the reporting of deficient facilities to the Social Security Administration as required by section 1397.20(c).

4. Make available to the public the list of facilities found in violation of a standard, as required by section 1397.20(d)(2)(iv), in a timely manner.

Inasmuch as plaintiffs have cited no specific deficiencies in the sections dealing with safety, sanitation and hygienic procedures the court finds no violation in those areas. In addition, on the basis of the materials presented, the court is unable to conclude that the Keys Amendment requires the recognition of a constitutional right to privacy which would be violated by allowing three residents to share a bedroom.

The court further finds on the basis of the parties' stipulations and facts which are not in dispute that the West Virginia Depart-

ment of Health and Human Services Administrative Rules for Residential Board and Care Homes, 64 C.S.R. 65, effective October 1, 1993, are in violation of West Virginia's statutory mandates in that they do not address the following matters:

1. Minimum numbers and qualifications of personnel as required by section 16–5C–5(b)(2);

2. Adequate minimum qualifications for administrators by training and experience as required by section 16–5C–6(b)(2);

3. Informing parties injured by a facility's violation of required standards of the possibility of seeking civil remedies as required by section 16–5C–8;

4. Bonding requirements for facilities handling residents' monies in excess of twenty-five dollars per resident and five hundred dollars for all residents in any month, as required by section 16–5C–7(b); and

5. Offering and sponsoring of educational and training programs as required by section 16–5C–3(i).

### 2. *Personal Care Homes*

■ As to personal care homes and their conformance with federal law, the parties stipulate that existing regulations do not require individual needs assessments, (Stips. 15(f) & 26); do not ensure referrals to appropriate services, (Stip. 28); do not assure accessibility for the handicapped, (Stip. 45); do not address the provision of technical assistance, (Stip. 46(a)); do not provide a written procedure for informing residents and/or their families and guardians of deficiencies in the facilities or of time periods for relocation, (Stip. 30); and do not require that deficient facilities be reported to the Social Security Administration, (Stip. 31). It is also stipulated that it is the practice not to release records of inspections of "deficiency statements" to the public until an approved plan of correction is done, which could be up to a year after a complaint is filed, (Stip. 47).

■ In addition, it is stipulated that personal care home regulations do not comport with West Virginia's statutory provisions for proper placement in an appropriate level of

care, (Stip. 23), and do not define the meaning of "extensive, on-going nursing care," (Stip. 25), resulting in a great number of residents in personal care homes who have significant medical and nursing care needs and degrees of mental illness or retardation requiring specially-tailored care that is not available in those homes, (Stip. 53). It is also agreed that existing regulations do not included a rating system, (Stip. 22); do not require cost disclosures or bonds, (Stips. 23 & 34); do not inform injured residents of the possibility of seeking civil remedies, (Stip. 36); do not adequately spell out qualifications for administrators, (Stip. 29); do not contain procedures for the assessment of civil penalties, (Stip. 38 and Defs.' App. 6); do not include minimum numbers and qualifications of personnel, (Stip. 6); and do not address the obligation to offer and sponsor educational and training programs, (Stip. 46(b) & (c)).

In other respects, plaintiffs contend, and defendants do not dispute, that existing personal care home regulations to not contain admission policies as required by federal law and do not address privacy rights by limiting the number of residents who may share a bedroom. With respect to privacy concerns, it is stipulated that there are no regulatory limits on the number of persons a facility may house, (Stip. 15.(c)), and that eight or more residents often share a bedroom in personal care homes, (Stip. 44). Plaintiffs further contend, without contradiction from defendants, that personal care home regulations do not provide for the classification of standards and assignment of numerical values to represent levels of compliance and do not provide for furnishing residents with a list of approved facilities and agencies that will help them relocate if a deficient facility fails to correct violations. A review of current regulations also reveals that they do not require periodic inspections.

Defendants nonetheless resist summary judgment with regard to the issues raised by plaintiffs on the general assertion that they are in compliance with federal and state law; that since 1983, the state has had regulations governing minimal standards for personal care homes; and that they are in the process of revising the regulations applicable to personal care homes with the expectation that they will be passed during the 1995 legislative session. (Aff. Sandra L. Daubman, Defs.' App. 7.) They also maintain that since July 13, 1993, resident assessment forms have been used when conducting complaint investigations and initial surveys and resurveys of unlicensed personal care homes, which assessments will identify inappropriate placements.[6] (*Id.* at Attach. 3.) On the bond requirement, they assert that a review of documents maintained by a past director shows that the majority of personal care homes did not handle residents' monies in an amount that required bonding.

Defendants' arguments indicate that efforts are being made to bring the state into compliance with federal and state requirements for personal care homes. Indeed, a comparison of the rules now in effect for personal care homes, (Defs.' App. 6), and the draft regulations dated February 24, 1993, (Defs.' App. 9), reveals that some deficiencies in the existing rules are addressed in the draft rules. For example, draft rule 6.1 contains more expansive guidelines for admission policies, (*compare* draft 6.1 and 6.4 *with* existing 7.1.3.(a)), and undertakes to describe "extensive, on-going nursing care" by giving examples of medical conditions or needs which disqualify a person from being accepted as a resident in a personal care home, (*see* draft 6.4.1.). The draft rules also provide for admission assessments, (draft 7.2) and continuing needs assessments after admission, *e.g.*, (draft 6.5., 7.2 and 7.3). However, other deficiencies in the existing rules are not ad-

---

**6.** The parties' stipulation No. 15(f) contains the statement that "[t]he parties disagree as to the existence of a federal mandate" requiring "individual care assessments of persons going into personal care homes." The statement is not supported by reference to anything and cannot form the basis for defeating summary judgment. Moreover, personal care homes come within the meaning of the Keys Amendment application to "group living arrangements," as that category is defined by HDS regulations to mean a "residential facility" which provides "both room and board and continuous protective oversight" and is either a medical or non-medical facility of any size "publicly or privately operated on a non-profit or for-profit basis." § 1397.5(a). As such, they must establish admission policies, including a continuous needs assessment. § 1397.20(a)(1).

dressed in the draft rules and the defendants' efforts to correct inadequacies cannot overcome the conclusion that violations now exist and will continue if the draft regulations are enacted in their current form.

There being no dispute but that the existing regulations fail to comply with the federal and state law requirements made the subject of plaintiffs' motion, and in order to ensure that any ultimate revision to the rules addresses the inadequacies apparent in the existing rules and the draft presented, the court makes the following findings with respect to the sufficiency of the current rules governing personal care homes.

The West Virginia Board of Health Legislative Rules governing Personal Care Home Licensure, Chapter 16–5C, Series II (1983), are in violation of the requirements of the Keys Amendment, 42 U.S.C. § 1382e, and section 1397.20 of the HDS regulations governing Standard Setting Requirements for Medical and Nonmedical Facilities where Supplemental Security Income Recipients Reside, by their failure to:

1. Establish standards governing:

a. admissions policies, including individual needs assessments and referrals to appropriate resources as required by 45 C.F.R. § 1397.20(a)(1)(i), and

b. protection of residents' civil rights by providing accessibility for handicapped residents as required by 45 C.F.R. § 1397.-20(a)(1)(iv) and its incorporation of current federal law respecting accessibility for individuals with a physical disability.

2. Establish procedures for enforcing the standards which

a. include periodic inspection of facilities as required by section 1397.20(b)(1)(i);

b. include provision of technical assistance as required by section 1397.20(b)(1)(ii); and

c. as required by section 1397.20(b)(2)(ii), specify time periods within which a deficient facility must correct violations of standards, and after a deficient facility fails to correct violations, for (1) informing residents and/or families and guardians of residents of standards which the facility does not meet, and

the time period during which residents may relocate, if they wish, before the deficient facility is reported to the Social Security Administration; and (2) provide residents with a list of approved facilities and agencies which will help them move.

3. Require the reporting of deficient facilities to the Social Security Administration as required by section 1397.20(c).

4. Make available to the public the list of facilities found in violation of a standard, as required by section 1397.20(d)(2)(iv), in a timely manner.

■ The court declines on the current record to find that the Keys Amendments requires recognition of a constitutional right to privacy that is violated by allowing as many as eight persons to share a bedroom. In the absence of more specific reference to how existing regulations in those areas are inadequate, the court similarly is unable to find a violation of the requirement of section 1397.-20(a)(1)(ii) and (iii) that standards be established on matters such as safety, sanitation and hygienic procedures.

The court further finds that the West Virginia Board of Health Legislative Rules governing Personal Care Home Licensure, Chapter 16–5C, Series II (1983), are in violation of state law in that they do not address the following statutory requirements:

1. Minimum numbers and qualifications of personnel as required by section 16–5C–5(b)(2);

2. Adequate minimum qualifications for administrators by training and experience as required by section 16–5C–6(b)(2);

3. Informing parties injured by a facility's violation of required standards of the possibility of seeking civil remedies as required by section 16–5C–8;

4. Bonding requirements for facilities handling residents' monies in excess of twenty-five dollars per resident and five hundred dollars for all residents in any month as required by section 16–5C–7(b);

5. Offering and sponsoring of educational and training programs as required by section 16–5C–3(i);

6. Written disclosure of costs which may be incurred as required by section 16–5C–7(a);

7. Classification of standards and assignment of a numerical value for evaluating levels of compliance as required by section 16–5C–5(c) and (d);

8. A rating system as required by section 16–5C–5(e);

9. Periodic unannounced inspections as required by section 16–5C–9;

10. Proper placement in an appropriate level of care by giving meaning to that portion of section 16–5C–2(e) which states that personal care homes may not house persons requiring "extensive, on-going nursing care;" and

11. Procedures for the assessment of civil penalties as required by section 16–5C–10(d).

B. *Enforcement of Standards and Procedures*

██ With respect to the defendants' conformance with their federal and state law obligation to enforce standards and enforcement procedures for nursing, personal care and residential board and care homes, *see* 42 U.S.C. 1382e, 45 C.F.R. 1397.1 and W.Va. Code § 16–5C–3(a), the parties stipulate that investigations of complaints of alleged violations in personal care and residential board and care homes may take up to thirty days or even six months, (Stip. 32 & 41); that prior to the institution of this suit, the state failed to effectively enforce existing standards in personal care homes, (Stip. 37); that between January 1990 and the institution of this suit on December 21, 1992, civil penalties were not used as an enforcement mechanism in nursing, residential board and care or personal care homes, and that prior to January 1990, civil penalties were used in nursing homes but not in residential board and care

or personal care homes, (Corrected Stip. 39); that between January 1990 and the institution of this suit, other enforcement procedures, such as admission bans, license terminations, temporary management, administrative appeals, and civil action, were rarely used,[7] (Stip. 40); and that after the filing of this suit, the defendants retained legal counsel [8] and a paralegal/investigator to represent OHFLAC and assist in enforcement activities, (Stip. 56).

Based on the above stipulations and the affidavit of Gail Falk (Pls.' App. 1), which is accepted as true for purposes of the pending motion, (Stip. 16(c)), plaintiffs contend that defendants do not conduct a "prompt investigation of all complaints and alleged violations" as required by West Virginia Code, section 16–5C–8, and that enforcement actions have been nonexistent or totally ineffective in that the only enforcement technique used is one based on inspection, citation of a deficiency in standards, and request for a plan of correction, which is in virtually all instances accepted without verification that corrections have been made (Falk Aff. at ¶ 73). No system exists for flagging emergency situations, for addressing overall managerial failings, for using enforcement procedures to compel corrective action, (Falk Aff. at ¶ 75), or for coordinating investigation responsibilities with other state agencies involved in rendering protective services to adults, (Falk Aff. at ¶ 87).

Apart from pointing out that enforcement activities have increased since the retention of legal assistance for OHFLAC, defendants provide no resistance to plaintiffs' contention that they are entitled to summary judgment on the matters discussed. The court accordingly finds that defendants are in violation of the Keys Amendment, 42 U.S.C. 1382e, section 1397.1 of the HDS regulations, and West Virginia Code section 16–5C–3(a) for their

---

**7.** During that time period, no civil actions were commenced against nursing homes, (Stip. 42(a)); no bans on admission were used against personal care homes, but were used a few times against nursing homes, (Stip. 42(b)); temporary management was used once against a nursing home but no temporary management was imposed on any residential board and care home or personal care home, (Stip. 42(d)); and between January 1990 and September 30, 1993, no termination activi-

ties were instituted against any personal care home and only one was used against a nursing home, (Stip. 42(c)).

**8.** A senior assistant to the attorney general was assigned to work full time with OHFLAC as of May 16, 1993. (Kramer Aff. at ¶ 75, Defs.'s App. 4.)

failure to effectively enforce standards for nursing, personal care and residential board and care homes, and of West Virginia Code section 16–5C–8 for their failure in given instances to investigate with reasonable dispatch complaints of alleged violations of standards in personal care and residential board and care homes.[9]

## II. *Disparate Impact Claims*

The second and third claims of the complaint are based on section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and Title II of the Americans with Disabilities Act, (hereinafter, ADA), 42 U.S.C. § 12132.[10]

For the second claim, the class of plaintiffs defined as "all present or future residents of residential board and care, personal care, and nursing homes in the State of West Virginia" alleges that the defendants' failure to meaningfully regulate or enforce regulatory standards applicable to their living arrangements has a disparate impact on members of the class in violation of section 504 of the Rehabilitation Act and Title II of the ADA. (Compl. at ¶ 86.)

Plaintiffs affected by the third claim, a subclass defined as "all present or future Medicaid eligible residents of residential board and care and personal care homes in the State of West Virginia," assert that defendants' failure to provide Medicaid-eligible residents of the homes in which they reside with meaningful access to Medicaid services has a disparate impact on members of the class in violation of section 504 of the Rehabilitation Act and Title II of the ADA. (Compl. at ¶ 87.)

■ Section 504 of the Rehabilitation Act of 1973 provides that: "[n]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied

the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance...." U.S.C. § 794. Section 504, by its language, is limited to programs or activities receiving federal financial assistance. Title II of the ADA broadens the protection extended to individuals with disabilities by prohibiting discriminatory treatment from public entities, including state departments and agencies, without regard to the receipt of federal financial assistance. *Coleman v. Zatechka,* 824 F.Supp. 1360, 1367 (D.Neb.1993); *see* 42 U.S.C. § 12131. Title II states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

■ In general, section 504 of the Rehabilitation Act seeks "to assure evenhanded treatment and the opportunity for [disabled][11] individuals to participate in and benefit from programs receiving federal assistance." *Alexander v. Choate,* 469 U.S. 287, 304, 105 S.Ct. 712, 721, 83 L.Ed.2d 661 (1985) (citing *Southeastern Community College v. Davis,* 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979)). The "evenhanded treatment" requirement of section 504 does not, however, impose an affirmative obligation on recipients of federal funds to expand existing programs. *Johnson by Johnson v. Thompson,* 971 F.2d 1487, 1494 (10th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1255, 122 L.Ed.2d 654 (1993); *Duquette ex rel. Duquette v. Dupuis,* 582 F.Supp. 1365, 1369 (D.N.H.1984). Rather, section 504 ensures only that disabled individuals receive the same treatment as those who are not disabled. *Chandler v. City of Dallas,* 2 F.3d 1385, 1389–90 (5th Cir.1993), *petition for cert.*

---

9. An alternative for consideration would be the establishment of categories of complaints based on their nature and the assignment, by category, of the maximum period in which the investigation will transpire.

10. In their complaint, plaintiffs also base their second and third claims on the equal protection of law guaranteed by the Fourteenth Amendment to the United States Constitution. Inasmuch as the motion for summary judgment does not put

forth an equal protection argument, the court does not address the issue.

11. Earlier versions of section 504 used the terms "handicapped individuals" and "individual with handicaps." The change to the word "disability" is "an effort to use currently acceptable terminology" and does not represent any substantive changes in the Rehabilitation Act. *Coleman,* 824 F.Supp. at 1367 n. 17.

*filed* Jan. 31, 1994; *Johnson by Johnson*, 971 F.2d at 1494. In other words, there is no requirement that all disabled persons be provided the same benefits as long as they receive "evenhanded treatment" in relation to the nondisabled. *P.C. v. McLaughlin*, 913 F.2d 1033, 1041 (2d Cir.1990) (citing *Traynor v. Turnage*, 485 U.S. 535, 548, 108 S.Ct. 1372, 1381–82, 99 L.Ed.2d 618 (1988) (quoting *Alexander*, 469 U.S. at 304, 105 S.Ct. at 721)); *see also Colin K. by John K. v. Schmidt*, 715 F.2d 1, 9 (1st Cir.1983) (expressing "serious doubts" that section 504 provides a claim "vis-a-vis other handicapped individuals"). *But cf. Martin v. Voinovich*, No. C–2–89–362, 1993 WL 542170, at * *96–97, *to be published at* 840 F.Supp. 1175, 1191–92, (S.D.Ohio Dec. 14, 1993) (failure to accommodate only the "severely handicapped" may be unreasonable and discriminatory if they are otherwise qualified to participate in the program and are excluded solely by reason of the degree of their disability); *Garrity v. Gallen*, 522 F.Supp. 171, 217 (D.N.H.1981) (federally funded programs, *"when viewed in their entirety,* must be readily accessible to all handicapped persons," and thus "profoundly retarded" must be served to the same extent as "mildly retarded") (emphasis in original).

■ Although the command of evenhanded treatment does not require affirmative action, it is recognized that in some instances the line between a rightful refusal to extend affirmative action and unlawful discrimination is not always clear. *E.g., Rothschild v. Grottenthaler*, 716 F.Supp. 796, 800 (S.D.N.Y.1989) (citing *Davis*, 442 U.S. at 412, 99 S.Ct. at 2370). Section 504 accordingly imposes the additional obligation of affording disabled individuals with the opportunity to participate in and benefit from programs offered by the recipient of federal financial assistance by providing them "meaningful access to the benefit that the grantee offers." *Alexander*, 469 U.S. at 301, 304, 105 S.Ct. at 720, 721–22. Federal grantees need not make " 'fundamental' " or " 'substantial' " changes in their programs to accommodate the disabled, *id.* at 300, 105 S.Ct. at 719–20 (quoting *Davis*, 442 U.S. at 412–13, 99 S.Ct. at 2370–71), but "reasonable accommodations in the grantee's program or benefit may have to be made," to assure meaningful access by those with a disability, *id.* at 301, 105 S.Ct. at 720. A "reasonable accommodation" is one which does not impose an undue financial or administrative burden on the grantee or necessitate a substantial alteration in its program. *Nathanson v. Medical College of Pa.*, 926 F.2d 1368, 1383, 1387 (3d Cir.1991); *see also Harris v. Thigpen*, 941 F.2d 1495, 1527 n. 48 (11th Cir.1991).

■ In the context of a state's participation in the federal Medicaid program, section 504 reserves to a participating state "substantial discretion to choose the proper mix of amount, scope and duration limitations on coverage." *Id.* 469 U.S. at 303, 105 S.Ct. at 721. Thus, within the confines of the Medicaid Act, a state may define the benefit it will provide, *id.*, but it may not provide an otherwise qualified individual with a disability with health benefits or services that are not as effective as those provided to others, *id.* at 304, 105 S.Ct. at 721–22 (citing 45 C.F.R. § 84.52(a)(3) (1984)). Nor may it adopt " 'criteria or methods of administration that have the purpose or effect of defeating or substantially impairing accomplishment of the objective of the recipient's program with respect to the [disabled].' " *Id.* at 304–05, 105 S.Ct. at 721–22 (quoting 45 C.F.R. § 84.4(b)(4)(ii) (1984)). The state accordingly must afford individuals with a disability meaningful and equal access to the Medicaid benefits or services offered to those without a disability and may be required to adjust its programs to achieve that result. *Id.* at 305–06 & fn. 25–26, 105 S.Ct. at 722–23 & fn. 25–26.

■ The sub-class of Medicaid-eligible residents on whose behalf the third claim is brought contend that, although eligible for Medicaid, they lack transportation to the services of health care providers. They maintain that the state should accommodate their need for transportation by including in the residential board and care and personal care home regulations a requirement that medical care for residents will be obtained when needed and that transportation to that care will be available. They also assert that transportation could be ensured by requiring

the state to adequately reimburse the provider for transportation costs.

In support of their claim that the failure to provide transportation is actionable under section 504, they point out, and defendants so stipulate, that lack of transportation impairs their ability to receive medical care and rehabilitative services, (Stip. 43(a)) and that the transportation guarantees they seek are required by the regulations governing adult family care homes,[12] (Stip. 35). It is further agreed that the Medicaid Act requires assurance of transportation to all recipients of Medicaid services. *See* 42 C.F.R. § 431.53.

The subclass of plaintiffs seeking relief under the third claim having made a prima facie case that they are being denied meaningful access to Medicaid services for which they are eligible and that a reasonable accommodation is possible, the burden shifts to defendants to demonstrate that they are unable to make the accommodation or that the proposed accommodation is unreasonable. *See Wood v. Omaha School Dist.*, 985 F.2d 437, 439 (8th Cir.1993). Defendants have failed to come forward with any showing of unreasonableness with respect to plaintiffs' proposed accommodation and, in particular, the inclusion of transportation assurances in the regulations governing residential board and care and personal care homes. Indeed, having made the assurances in the adult family care home regulations and having failed to challenge them here, defendants must be deemed to acknowledge their reasonableness. Plaintiffs are accordingly entitled to a similar accommodation of transportation assurance in the regulations governing residential board and care and personal care homes.

■ Plaintiffs' second claim is based on the general proposition that the defendants' failure to meaningfully regulate or enforce regulatory standards is unlawful discrimination on the basis of disability and is thus actionable under section 504 or Title II of the ADA. The focus of the residential board and care and personal care residents is on the disparity between the treatment they receive and that afforded residents of nursing and adult family care homes where state regulatory standards and enforcement practices are in compliance with federal and state laws, emphasis is placed on quality of care and quality of life, privacy rights are better protected by limiting bedroom occupancy to one or two residents, more training is provided to personnel, accessibility for the handicapped is required, and reimbursement for care is at a higher rate.

To the extent that the second claim is viewed as seeking meaningful access to the benefits made available to residents of nursing and adult family care residents by governing regulations, most of the disparities will be eliminated by the court's rulings in favor of the plaintiffs on their first claim under the Keys Amendment. Requiring defendants to bring residential board and care and personal care home regulations into compliance with federal and state law by including substantially the same provisions now in existence for nursing and adult family care homes will correct the major deficiencies addressed by plaintiffs. In other respects, the second claim must be viewed as alleging disparity vis-a-vis other disabled individuals, not the nondisabled. Moreover, the disparity, if any, is not based on the degree of disability but rather on the particular living arrangement inasmuch as it is those with both milder and more severe disabilities who are perceived to be better treated. The court accordingly concludes that the second claim is not actionable under section 504 or, by logical extension, *see U.S. E.E.O.C. v. AIC Sec. Investigation, Ltd.*, 820 F.Supp. 1060, 1064 (N.D.Ill.1993) (applying section 504 case law in interpreting the ADA), under Title II of the ADA.

### III. *Wheelchair Accessibility*

The subclass of plaintiffs described as "all present or future residents of residential board and care and personal care homes," allege in the eighth claim that by failing to enforce wheelchair accessibility in personal

---

12. "Adult family care homes" serve one to three ambulatory disabled or elderly individuals who need the support, protection and security of family living in a homelike environment that is less restrictive than that offered in personal care, residential board and care or nursing homes. (Stips. 1 & 12(a)–(b).)

care and residential board and care homes, defendants are in violation of section 504 of the Rehabilitation Act of 1973 and Title III of the ADA, 42 U.S.C. 12182, which prohibits discrimination in places of public accommodation on the basis of disability. (Compl. ¶ 92.) Inasmuch as the court has reservations with respect to the applicability of the public accommodation provisions of Title III of the ADA to the homes affected by the eighth claim [13] and the relief sought by plaintiffs will essentially be obtained by virtue of the court's ruling on the first claim to the extent that it requires regulations providing for accessibility for the handicapped, summary judgment on the eighth claim will be denied.

### IV. *Conclusion*

For the reasons stated, it is ORDERED that plaintiffs' motion for summary judgment be, and the same hereby is, granted in part and denied in part.

The motion is granted in the following respects:

1. As to the first claim, to the extent that the court found that existing regulations governing residential board and care and personal care homes are in violation of federal and state law and that the defendants have failed to adequately enforce the regulations.

2. As to the third claim, to the extent that plaintiffs seek to require defendants to include in the regulations for residential board and care and personal care homes transportation assurances comparable to those contained in existing adult family care home regulations.

The motion is denied with respect to the second and eighth claims.

The parties are accordingly ordered to confer and develop a remedial plan for correcting and implementing proposed changes to existing residential board and care and personal care regulations and enforcement procedures which will incorporate the court's findings herein and to submit the plan to the court within ninety days, together with a

proposed timetable for implementing the changes.

---

13. For example, Title III does not include in its definition of "public accommodation" an "establishment located within a building that contains not more than five rooms for rent or hire and that is actually occupied by the proprietor of such establishment as the residence of such proprietor." 42 U.S.C. 12181(7)(A).