462 S.E.2d 586

**STATE of West Virginia ex rel. Laura MEADOWS and Danny Martin, Petitioners,**

v.

**Ken HECHLER, Secretary of State of West Virginia; Earl Ray Tomblin, President of the Senate of West Virginia; and Robert C. Chambers, Speaker of the House of Delegates of West Virginia, Respondents.**

No. 22875.

Supreme Court of Appeals of West Virginia.

Submitted June 27, 1995.

Decided July 19, 1995.

**12**

Daniel F. Hedges, Charleston, for Petitioners.

Daynus Jividen, Assistant Attorney General, Charleston, for Respondent Secretary of State.

Michael R. Crane, Jennifer Bailey Walker, Charleston, for Respondent Tomblin.

M.E. Mowrey, Charleston, for Respondent Chambers.

WORKMAN, Justice:

Petitioners Laura Meadows and Danny Martin [1] seek a writ of mandamus [2] to compel the filing of certain agency regulations pertaining to personal care homes by Respondent [3] West Virginia Secretary of State ("Secretary").[4] As grounds for the requested relief, Petitioners aver that West Virginia Code § 29A–3–12(b) (Supp.1994) is unconstitutional in that it violates the separation of powers provision of Article V, Section 1 of the West Virginia Constitution by enabling the Legislature to prohibit the implementation of specifically mandated regulations through purposeful languishment in legislative committees. Upon careful consideration of this issue, we conclude that West Virginia Code § 29A–3–12(b) is unconstitutional.

Discussion of this case requires a recitation of certain factual and procedural matters that impelled the filing of the instant action. In 1988, the Legislature substantially amended chapter sixteen of the West Virginia Code as it pertained to licensure, standards, and enforcement procedures for personal care homes.[5] See W.Va.Code §§ 16–5C–1 to –18 (1995). One of the revised sections mandated that the Board of Health [6] propose legislative rules establishing certain minimum standards for the operation and licensure of personal care homes for promulgation pursuant to the West Virginia Administrative Procedures Act ("APA"), West Virginia Code §§ 29A–3–1 to –17 (1993 & Supp.1994). See W.Va.Code § 16–5C–5. The Legislature delegated responsibility for developing the proposed regulations to the Office of Health Facility Licensure and Certification.

In 1992, Petitioners' counsel instituted a class action in the United States District Court for the Southern District of West Virginia based on the lack of state regulations governing West Virginia's personal care

---

1. Both of these individuals are residents of the Kate Boone Personal Care Home in Oak Hill, West Virginia.

2. Original jurisdiction is asserted under West Virginia Code § 53–1–2 (1994) and pursuant to Article III, Section 3 of the state constitution.

3. Also named as respondents to this action are Earl Ray Tomblin as President of the Senate and Robert C. Chambers as Speaker of the House of Delegates. They are named as parties pursuant to this Court's admonition in *Common Cause of West Virginia v. Tomblin*, 186 W.Va. 537, 539, 413 S.E.2d 358, 360 n. 2 (1991).

4. The Secretary maintains that he was improperly joined as a party to this proceeding as the petition fails to aver that he did anything improper, illegal, or unconstitutional. Petitioners obviously included the Secretary as a party to this action with the hope that the Court would ultimately direct the Secretary to file the proposed regulations as approved in the state register. We concur with the Secretary's observation that his joinder was not required to effectuate any prospective filing of the regulations at issue, as he would be required by law to file any approved regulations. See W.Va.Code §§ 29A–2–1 to –5 (1993).

5. Personal care homes are defined by statute as:

    any institution, residence or place, or any part or unit thereof, however named, in this state which is advertised, offered, maintained or operated by the ownership or management, whether for a consideration or not, for the express or implied purpose of providing accommodations and personal assistance and supervision, for a period of more than twenty-four hours, to four or more persons who are dependent upon the services of others by reason of physical or mental impairment who may require limited and intermittent nursing care, including those individuals who qualify for and are receiving services coordinated by a licensed hospice....

    W.Va.Code § 16–5C–2(e).

6. The Board of Health is now the Department of Health and Human Resources.

homes.[7] Through the complaint filed in that action, it was averred that the absence of adequate regulations, standards, and enforcement provisions violated the federal Keys Amendment[8] as well as the prohibition against handicap discrimination. *See Wolford ex rel. Mackey v. Lewis*, 860 F.Supp. 1123 (S.D.W.Va.1994). By order entered on March 21, 1994, the district court granted the *Wolford* plaintiffs' motion for summary judgment. The order granting summary judgment includes findings that the West Virginia regulations governing personal care homes do not comply with the applicable Keys Amendment provisions or state law mandating that new regulations be implemented. Because of this lack of compliance with state and federal law, the district court ordered that a remedial plan be submitted to and approved by it within ninety days. *Id.* at 1137.

The DHHR timely submitted the West Virginia Comprehensive Long–Term Care Plan ("Plan") required by *Wolford* with the district court in June 1994.[9] According to the timetable included in the Plan, all of the substantive standards pertaining to personal care homes were to be in effect and implemented by June 1, 1995. The Plan further required that regulations regarding enforcement procedures were to be drafted by July 1, 1994, and to be finalized by July 1, 1995. Petitioners assert that the proposed regulations had to be filed in August 1994 to allow for legislative approval during the 1995 regular legislative session.

On August 15, 1994, the DHHR filed the proposed legislative rules regarding personal care homes with the legislative rule-making review committee ("Committee") and the Secretary. On January 1, 1995, the proposed rules were approved, with minor modifications, by the Committee. As required by West Virginia Code § 29A–3–11(c), the Committee filed notice of its approval of the proposed rules in the state register and the modified proposed rules were filed with the Secretary of State on January 16, 1995. In accordance with West Virginia Code §§ 29A–3–11 and –12, bills authorizing the promulgation of the proposed rules were introduced in the Senate on January 20, 1995, and in the House of Delegates ("House") on January 23, 1995.

The President of the Senate triple referred the Senate bill to the Committees on Health and Human Resources, Finance, and the Judiciary. On February 10, 1995, the Senate Committee on Health and Human Resources recommended passage of the bill and sent the bill to the Finance Committee. Then on February 28, 1995, the Senate Finance Committee tabled the bill by voice vote.

Prior to the recommendation of passage by the Senate Committee on Health and Human Resources, the House Committee on Health and Human Resources had already rendered the same recommendation on February 2, 1995. The House bill, however, did not proceed to the House Judiciary Committee for consideration when it was learned that the Senate version of the bill had died in the Finance Committee. No further consideration of the bill was made by either the Senate or the House.

This original proceeding was initiated to determine whether West Virginia Code § 29A–3–12(b), which permits proposed administrative regulations to "die" if the Legislature fails to take action on them, is a violation of our constitutional separation of powers requirement found in article V, section 1.[10] The language of West Virginia Code § 29A–3–12(b) provides that:

---

7. The suit was also filed on behalf of all present or future residents of West Virginia residential board and care facilities and nursing homes. *See Wolford ex rel. Mackey v. Lewis*, 860 F.Supp. 1123, 1126 (S.D.W.Va.1994).

8. The Keys Amendment is an amendment to the Supplemental Security Income Program, 42 U.S.C. § 1382e, which "is designed to insure that Supplemental Security Income benefits are not used to pay for substandard living arrangements." *Wolford*, 860 F.Supp. at 1126.

9. The district court order approving the plan was entered on October 4, 1994.

10. Article V, section 1 provides:

The legislative, executive and judicial departments shall be separate and distinct, so that neither shall exercise the powers properly belonging to either of the others; nor shall any person exercise the powers of more than one of them at the same time, except that justices of the peace shall be eligible to the legislature.

If the Legislature fails during its regular session to act upon all or part of any legislative rule which was submitted to it by the legislative rule-making review committee during such session, no agency may thereafter issue any rule or directive or take other action to implement such rule or part thereof unless and until otherwise authorized to do so.

*Id.* Petitioners argue that the broad legislative veto power created by West Virginia Code § 29A-3-12(b) upsets the balance of power required between the executive and legislative branches of state government by invasively intruding into executive function.[11]

The separation of powers doctrine [12] expressly stated in our constitution [13] is a core principle of our system of government, whose roots can be traced back to the founding of this country. *See Hodges v. Public Serv. Comm'n,* 110 W.Va. 649, 652–54, 159 S.E. 834, 835–36 (1931) (discussing the origin of the separation of powers principle and noting "that the very first resolution passed in the convention which framed our national Constitution called for a separation of governmental powers"); *see generally Buckley v. Valeo,* 424 U.S. 1, 120–24, 96 S.Ct. 612, 682–85, 46 L.Ed.2d 659 (1976). In *State ex rel. State Building Commission v. Bailey,* 151 W.Va. 79, 150 S.E.2d 449 (1966), we discussed this fundamental precept of government:

'The Constitution, in distributing the powers of government, creates three dis-

tinct and separate departments—the legislative, the executive, and the judicial. This separation is not merely a matter of convenience or of governmental mechanism. Its object is basic and vital, namely, to preclude a commingling of these essentially different powers of government in the same hands. * * *.

If it be important thus to separate the several departments of government and restrict them to the exercise of their appointed powers, it follows, as a logical corollary, equally important, that each department should be kept completely independent of the others—independent not in the sense that they shall not cooperate to the common end of carrying into effect the purposes of the Constitution, but in the sense that *the acts of each shall never be controlled by, or subjected, directly or indirectly, to, the coercive influence of either of the other departments....'*

In considering the importance of provisions relating to the separation of the departments of government, the Supreme Court of the United States in *Kilbourn v. Thompson,* 103 U.S. 168, 26 L.Ed. 377, said: 'It is believed to be one of the chief merits of the American system of written constitutional law, that all the powers intrusted to government, whether State or national, are divided into the three grand departments, ... *It is ... essential to the successful working of this system that the*

W.Va. Const. art. V, § 1.

**11.** Petitioners also contend that the exercise of legislative veto in the context of an express legislative delegation pertaining to a comprehensive regulatory scheme is unconstitutional because it prevents compliance with substantive law and thereby interferes with execution of the law. Petitioners further posit that, even if legislative veto were constitutionally permissible in limited scenarios, it could never be exercised via legislative inaction and be consistent with legislative function as mandated by article VI, section 1 of the state constitution and could never be exercised without presentment to the governor as required by article VII, section 14 of the constitution. Because we find West Virginia Code § 29A-3-12(b) to be unconstitutional on the original separation of powers argument raised by Petitioners, we do not address these alternate grounds.

**12.** As noted in *Consumer Energy Council of America v. Federal Energy Regulatory Comm'n,* 673 F.2d 425 (1982), *aff'd sub nom. Process Gas*

Consumers Group v. Consumer Energy Council, 463 U.S. 1216, 103 S.Ct. 3556, 77 L.Ed.2d 1402 (1983),

Justice Brandeis' famous quotation still stands as the most concise statement of this objective:
'The doctrine of the separation of powers was adopted by the Convention of 1787, not to promote efficiency but to preclude the exercise of arbitrary power. The purpose was, not to avoid friction, but, by means of inevitable friction incident to the distribution of governmental powers among the three departments, to save the people from autocracy.'
673 F.2d at 471 (quoting *Myers v. United States,* 272 U.S. 52, 47 S.Ct. 21, 71 L.Ed. 160 (1926)) (Brandeis, J., dissenting).

**13.** In contrast, the United States Constitution does not contain an express separation of powers provision.

*persons intrusted with power in any one of these branches shall not be permitted to encroach upon the powers confided to the others, but that each shall by the law of its creation be limited to the exercise of the powers appropriate to its own department and no other.'*

151 W.Va. at 85–86, 150 S.E.2d at 453 (quoting, in part, *O'Donoghue v. United States,* 289 U.S. 516, 530, 53 S.Ct. 740, 743, 77 L.Ed. 1356 (1933)) (citation omitted) (emphasis supplied).

■ We crystallized the significance of the separation of powers doctrine in syllabus point one of *State ex rel. Barker v. Manchin,* 167 W.Va. 155, 279 S.E.2d 622 (1981):

Article V, section 1 of the Constitution of West Virginia which prohibits any one department of our state government from exercising the powers of the others, is not merely a suggestion; it is part of the fundamental law of our State and, as such, it must be strictly construed and closely followed.

*Id.* at 155–56, 279 S.E.2d at 624.

West Virginia Code § 29A–3–12(b) grants, in effect, an outright veto power to the Legislature by permitting that branch to block the implementation of proposed agency regulations "[i]f the Legislature fails during its regular session to act upon all or part of any legislative rule ... submitted to it by the legislative rule-making review committee." The question before us is whether this unchecked legislative veto power over administrative agency rules impermissibly encroaches upon the functioning of the executive branch in violation of the separation of powers provision of our constitution.

Respondents Tomblin and Chambers (hereinafter the "legislative Respondents") [14] plenarily deny the existence of a separation of powers issue. They argue that the executive branch and the attendant concerns of separation of powers are not introduced into the rule-making equation until the Legislature actually approves of proposed agency rules. The legislative Respondents premise their reasoning upon the postulate that rule-making "at its essence, [is] a legislative function" which only becomes executive in function upon an express delegation of authority by the Legislature. Specifically, the legislative Respondents contend that: "The agency was never authorized to act, only to propose a rule. The agency has no power to promulgate the rule until such time as the Legislature ... has authorized the promulgation." Based on this view that the executive branch lacks authority to promulgate regulations, the legislative Respondents deny the existence of a legislative veto arising from the provisions of West Virginia Code § 29A–3–12(b). In other words, until the Legislature approves of proposed regulations, no delegation of executive authority has occurred and therefore, no separation of powers problem comes into existence.

■ Not only do we find this argument to be spurious, but as Petitioners observe, such a position "is the most extreme assertion of legislative authority." [15] As we explained in *Barker,* "When the Legislature delegates its rule-making power to an agency of the Executive Department, as it did here ..., it vests the Executive Department with the mandatory duty to promulgate and to enforce rules and regulations." 167 W.Va. at 169, 279 S.E.2d at 631. Contrary to the argument advanced by the legislative Respondents, the rule-making function comes under the executive department's bailiwick upon the delegation of the duty to propose rules for promulgation. *See id.* at 168, 279 S.E.2d at 631 (recognizing Legislature's option to delegate to the Executive its power to enact rules and regulations to protect the welfare, safety and health of the public); *accord Nonintoxicating Beer Comm'r v. A & H Tavern,* 181 W.Va. 364, 366, 382 S.E.2d 558, 560 (1989); *see also Consumer Energy Council of America v. Federal Energy Regulatory Comm'n,* 673 F.2d 425, 471 (1982), *aff'd sub nom. Process Gas Consumers Group v. Consumer Energy Council,* 463 U.S. 1216, 103 S.Ct. 3556, 77 L.Ed.2d 1402 (1983) (recognizing

---

**14.** *See supra* note 3.

**15.** Petitioners' counsel notes that "in the many cases striking down legislative veto, such a contention of the breadth of permissible legislative authority has never been made."

that United States "Supreme Court has held that rulemaking is substantially a function of administering and enforcing the public law ... [and] [a]s such, Congress may not create a device enabling it, or one of its houses, to control agency rulemaking"); *General Assembly of New Jersey v. Byrne*, 90 N.J. 376, 448 A.2d 438, 443 (1982), *superceded by statute/rule on other grounds as stated in Kimmelman v. Burgio*, 204 N.J.Super. 44, 497 A.2d 890 (1985) (recognizing that "administrative agencies are the arms of the executive branch of government through which it executes the laws").

■ In the *Barker* case, we examined the provision of the APA which previously permitted the legislative rule-making review committee to veto rules and regulations otherwise validly promulgated[16] and concluded that such provision violated the separation of powers doctrine. 167 W.Va. at 166–78, 279 S.E.2d at 630–36. In reaching that conclusion, we stated:

What the Legislature has attempted to do here is to invest itself with the power to promulgate rules having the force and effect of law outside the constitutional limitations imposed upon the legislative branch in the exercise of that power. In effect, the Legislature abdicates in favor of the executive its power to make rules and then asserts that because the rule-making power so delegated is legislative in nature, it

may step into the role of the executive and disapprove or amend administrative regulations free from the constitutional restraints on its power to legislate.... Such a mechanism for legislative review of executive action may properly be called an 'extra-legislative control device' for it permits the Legislature to act as something other than a legislative body to control the actions of the other branches. This is in direct conflict with our constitutional requirement of separation of powers. The power of the Legislature in checking the other branches of government is to legislate. While the Legislature has the power to void or to amend administrative rules and regulations, when it exercises that power it must act as a legislature through its collective wisdom and will, within the confines of the enactment procedures mandated by our constitution. It cannot invest itself with the power to act as an administrative agency in order to avoid those requirements.

Id. at 172–73, 279 S.E.2d at 633 and Syl. Pt. 2 (citation omitted). The Legislature responded to *Barker* by amending West Virginia Code § 29A–3–11 to delineate the Committee's review function and further, to limit the Committee's power concerning passage or denial of proposed regulations to making a recommendation to the Legislature.[17]

---

**16.** The version of West Virginia Code § 29A–3–11 in effect at the time of *Barker* provided, in pertinent part, that the legislative rule-making committee "shall study all proposed rules or regulations and ... [w]ithin six months after the proposed rule or regulation is presented to the committee, the committee shall either approve, approve in part and disapprove in part, or disapprove the proposed rule or regulation...."

**17.** In response to the *Barker* decision, the Legislature amended West Virginia Code § 29A–3–11 to delineate the review and recommendation functions of the Committee. Pursuant to subsection b of West Virginia Code § 29A–3–11, the Committee's review of a proposed legislative rule

shall include, but not be limited to, a determination of: (1) Whether the agency has exceeded the scope of its statutory authority in approving the proposed legislative rule; (2) Whether the proposed legislative rule is in conformity with the legislative intent of the statute which the rule is intended to implement, extend, apply, interpret or make specific;

(3) Whether the proposed legislative rule conflicts with any other provision of this code or with any other rule adopted by the same or a different agency; (4) Whether the proposed legislative rule is necessary to fully accomplish the objectives of the statute under which the rule was proposed for promulgation; (5) Whether the proposed legislative rule is reasonable, especially as it affects the convenience of the general public or of persons particularly affected by it; (6) Whether the proposed legislative rule could be made less complex or more readily understandable by the general public; and (7) Whether the proposed legislative rule was proposed for promulgation in compliance with the requirements of this article and with any requirements imposed by any other provision of this code.

Subsection c of West Virginia Code § 12A–3–11 requires that

[a]fter reviewing the proposed legislative rule, the committee shall recommend that the Legislature: (1) Authorize the promulgation of the legislative rule, or (2) Authorize the promul-

There is very little to distinguish between what we found to be unconstitutional in *Barker* and what is at issue here. In *Barker*, we found a separation of powers violation resulting from the provisions of the APA which authorized the legislative rule-making review committee to veto proposed administrative rules and regulations. Id. at 178, 279 S.E.2d at 636 and Syl.Pt. 3. Borrowing from the reasoning articulated by H. Lee Watson in his article, *Congress Steps Out; A Look at Congressional Control of the Executive*, 63 Cal.L.Rev. 983 (1975), we identified in *Barker* the inherent shortcomings of permitting direct legislative review of executive action without the countervailing safeguards of the enactment process:

> Watson concludes that the legislative committee veto is the most clearly constitutionally invalid of the legislative control devices, rendered invalid per se by virtue of its impact on the process. By placing the final control over governmental actions in the hands of only a few individuals who are answerable only to local electorates, the committee veto avoids the concept of 'constitutional averaging' foreseen by the framers of the constitution as a means of balancing the dual role given legislators. While Watson views this consequence to our system of government as the most significant constitutional deficiency of the committee veto, he also considers it infirm in that it gives a small portion of the legislative membership a continuing role in governmental decision making once the formal lawmaking processes have been completed. The legislature vests the members of the committee with a post-legislative discretionary power, the exercise of which impermissibly fosters legislative dominance and expansion of power in several ways. First, by providing that the executive exercises discretion only at the pleasure of the reviewing committee, the legislature usurps the traditional role of the executive to fill in the interstices left by flexible statutory standards by exercising legislatively delegated discretionary power. In effect the executive exercise of discretion is replaced by committee exer-

cise of discretion, increasing the role of the legislature at the expense of the executive.

167 W.Va. at 177, 279 S.E.2d at 635–36.

Petitioners argue that the proposed regulations were prevented from being approved by the full Legislature because of one or two individuals who were acting at the behest of special interest groups. Since the legislative Respondents do not dispute Petitioners' contention that the tabling of the proposed regulations can be and was effectuated by one or two individuals, the separation of powers concerns that Watson, *supra*, described are obviously present here. Moreover, this ability of a few individuals to curb further consideration of proposed regulations illustrates the very abuse of power that our country's forefathers sought to prevent by requiring a separation of the three branches of government.

In the case of *Byrne*, the New Jersey Supreme Court reviewed a legislative veto statute which permitted "the Legislature to veto by a concurrent resolution of both houses '[e]very rule hereafter proposed by a State agency,' with certain limited exceptions." 448 A.2d at 439. The court ruled that the statute violated the separation of powers principle

> by excessively interfering with the functions of the executive branch. The Legislature's power to revoke at will portions of coherent regulatory schemes violates the separation of powers by impeding the Executive in its constitutional mandate to faithfully execute the law. The legislative veto further offends the separation of powers by allowing the Legislature to effectively amend or repeal existing laws without participation by the Governor.

*Id.*

The full impact of legislative veto was realized in *Byrne:*

> Even where the Legislature is not using its veto power to effectively change the law, the veto can illegitimately interfere with executive attempts to enforce the law. The chief function of executive agencies is

---

gation of part of the legislative rule, or (3) Authorize the promulgation of the legislative

rule with certain amendments, or (4) Recommend that the proposed rule be withdrawn.

to implement statutes through the adoption of coherent regulatory schemes. The legislative veto undermines performance of that duty by allowing the Legislature to nullify virtually every existing and future scheme of regulation or any portion of it. The veto of selected parts of a coherent regulatory scheme not only negates what is overridden; it can also render the remainder of the statute irrational or contrary to the goals it seeks to accomplish. . . . Moreover, the Legislature need not explain its reasons for any veto decision. Its action therefore leaves the agency with no guidance on how to enforce the law.

Broad legislative veto power deters executive agencies in the performance of their constitutional duty to enforce existing laws. Its vice lies not only in its exercise but in its very existence. Faced with potential paralysis from repeated uses of the veto that disrupt coherent regulatory schemes, officials may retreat from the execution of their responsibilities. They will resort to compromises with legislative committees aimed at drafting rules that the current Legislature will find acceptable.

*Id.* 448 A.2d at 443–44.

■ In our case, the Legislature delegated a broad responsibility to the Executive branch for the purpose of establishing standards and enforcement mechanisms concerning personal care homes. After the Executive branch developed the regulations necessary to implement the comprehensive regulatory scheme, implementation was thwarted by legislative veto. The veto amounted to an intrusion into the Executive branch's ability to effectuate its mandated responsibilities. Accordingly, we determine that the legislative veto contained within the APA is unconstitutional based upon the same reasoning expressed in *Barker* and *Byrne*. West Virginia Code § 29A–3–12(b) violates the separation of powers requirement of Article V, Section 1 of the Constitution of West Virginia in that the legislative veto created through such section impermissibly encroaches upon the

executive branch's obligation to enforce the law.

Especially troubling regarding the legislative veto which occurred in this case is the resulting noncompliance with a federal court order. It is significant to note that Respondents raise no substantive objections to implementing the proposed regulations. The eighty-nine pages of modified proposed regulations, as recognized by the Committee, are necessary to fully accomplish the objectives of the statute under which the proposed regulations were promulgated. Yet, because of the possible involvement of special interests and because of a statutory provision that permitted legislative veto through committee inaction, the long-overdue regulations [18] regarding personal care homes have not been implemented and West Virginia remains out of compliance with federal law.

While it remains for the Legislature to draft a new provision for the APA regarding the approval or disapproval of administrative regulations, we observe that several states permit regulations to automatically go into effect if the Legislature fails to reject the proposed regulations within a specified number of days. *See* Conn.Gen.Stat.Ann. § 4–170(c) (West 1988) (providing that failure of joint legislative committee to act upon proposed regulations within sixty-five days after submission results in automatic approval); Ohio Rev.Code Ann. § 119.03(I) (1994) (providing that rule-making agency may adopt proposed rule if legislature fails to invalidate proposed rule during sixty-day period following filing of original version of rule); Okla. Stat.Ann. tit. 75, § 308I (West 1995) (providing that automatic approval occurs if legislature fails to disapprove proposed rule within thirty legislative days); cf. Mich.Comp.Laws Ann. § 24.245(10)(a) (West 1994) (stating that failure of joint legislative committee to approve of proposed administrative rule within sixty days requires approval by general assembly for implementation).

At least two states have codified exceptions to compliance requirements for legislative approval of administrative regulations in certain circumstances. Ohio does not re-

---

18. The court observed in *Wolford* that "regulations governing personal care homes have not

changed significantly in over twenty years. . . ." 860 F.Supp. at 1128.

quire that its administrative procedures be followed with regard to:

> Any proposed rule, amendment, or rescission that must be adopted verbatim by an agency pursuant to federal law or rule, to become effective within sixty days of adoption, in order to continue the operation of a federally reimbursed program in this state, so long as the proposed rule contains ... (a) A statement that it is proposed for the purpose of complying with a federal law or rule; (b) A citation to the federal law or rule that requires verbatim compliance.

Ohio Rev.Code Ann. § 119.03(H)(2). Similarly, Michigan has a special exemption for "a rule that is promulgated under the Michigan occupational safety and health act, that is substantially similar to an existing federal standard that has been adopted or promulgated under the occupational safety and health act of 1970." Mich.Comp.Laws Ann. § 24.245(13) (West 1994) (citations omitted).

The Ohio statute, which provides for implementation of administrative regulations without adherence to typical approval procedures where compliance with federal law is at issue, illustrates a need for consideration of analogous legislation in this state. A statutory provision similar to that of Ohio might eliminate the procedural quagmire in which this state is now ensnared—noncompliance with federal law due to unimplemented regulations, that were otherwise validly promulgated. While the Ohio statute's premise is tied to losing federal funds for noncompliance, the absence of lost federal funds [19] does not negate the need for an alternate statutory method by which regulations necessary for compliance with federal and state mandates can be implemented.

■ As we explained in *Barker*, we do not advocate the elimination of all legislative review of administrative rule-making:

> Legislative rule-making review has purpose and merit and may be beneficially exercised and employed when contained within its proper and constitutional sphere ... We do not question that some procedure for review of agency rules and regulations may well be warranted, but we must require that it be done within the limits of the separation of powers doctrine and according to the system of checks and balances in our governmental framework.

167 W.Va. at 175–76, 279 S.E.2d at 634–35 (footnote omitted).

Based on the foregoing, the writ of mandamus is granted insofar as we determine that the legislative veto scheme encompassed within West Virginia Code § 29A–3–12(b) is unconstitutional. In *Barker*, we ordered the Secretary of State to file as approved and to place in force and effect the regulations at issue there.[20] 167 W.Va. at 178, 279 S.E.2d at 636. We hesitate to order the filing of the regulations in the instant case without their having had legislative review, although we could do so. As a matter of comity to the Legislature, we decline to do so at this time in order to give the Legislature the opportunity in its next regular session to consider the regulations. Further, we direct the Legislature to promptly draft legislation to replace the unconstitutional section of article 29A and additionally, to consider passage of legislation that would exempt certain administrative regulations from conformance with APA implementation requirements, such as where compliance with federal law is mandated. Should the Legislature fail to exercise its proper prerogative to consider these reg-

---

19. Under 42 U.S.C. § 1382e(e)(4) (1988), the penalty for noncompliance with the Keys Amendment requires that supplemental security income "[p]ayments made under this subchapter with respect to any individual shall be reduced by an amount equal to the amount of any supplementary payment ... (1) to such individual as a resident or an inpatient of such institution if such institution is not approved as meeting the stan-

dards...." *Id.* Petitioners argue that the funds which stand to be lost are federal in nature, whereas the legislative Respondents maintain that the funds emanate from the state. We take no position on this issue.

20. The approval of those regulations was a matter of some urgency, as they dealt with mine safety regulations.

ulations and to consider such recommended legislation, then this Court will be required to fill these legal voids.

Writ granted as molded.

BROTHERTON, J., did not participate.

Judge FOX sitting by temporary assignment.